MILES, APPELLANT, *v.* BUTTE ELECTRIC AND POWER COMPANY, RESPONDENT.

(No. 2,030.)

(Submitted December 19, 1904. Decided February 15, 1905.)

*Water Rights — Appropriation — Validity — Statutes — Evidence—Sufficiency—Nonsuit.*

Water Rights—Appropriation—Statutory Requirements—Evidence.
  1. In an action for damages for using the water of a certain river, and for an injunction to prevent interference with the alleged rights of plaintiff therein, evidence examined, and *held* to warrant a nonsuit for failure of the plaintiff to comply with the requirements of Compiled Statutes, fifth division, sections 1250, 1251, 1256 and 1257, in

making his alleged appropriation, in that he never diverted the water claimed to have been appropriated, or constructed any dam, ditch, flume, or work of any kind to convey water to any place for a beneficial purpose, or owned the land described in his notice, or any mine, mill, smelter, ranch or property to which the water right was appurtenant, and on which the water could be utilized.

Water Rights—Appropriation—User.

2.  Until a claimant is himself in a position to use the water of a stream subject to appropriation, the right to the water, or water right, does not exist in such sense that the mere diversion of the water by another is a ground of action either to recover the water, or for damages for its diversion.

*Appeal from District Court, Silver Bow County; E. W. Harney, Judge.*

ACTION by Frank R. Miles against the Butte Electric and Power Company. From a judgment for defendant, plaintiff appeals. Affirmed.

*Mr. J. S. Shropshire,* and *Mr. G. W. Stapleton,* for Appellant.

*Messrs. Kirk & Clinton,* for Respondent.

MR. COMMISSIONER BLAKE prepared the opinion for the court.

This is an appeal from a judgment entered in favor of defendant for costs after the motion for nonsuit was sustained. The defendant is a corporation organized under the laws of the state of New Jersey, and doing business in the state of Montana. The plaintiff filed his complaint August 9, 1902, and prayed for damages in the sum of $150,000, and also for an injunction restraining the defendant from using certain water, and interfering with the rights of plaintiff to the further enjoyment thereof. The material allegations of the complaint are that plaintiff since the year 1889, by appropriation under the laws of the state of Montana, "has been the owner, in possession, and entitled to the possession, use and enjoyment, of five thousand inches" of the waters of the Big Hole river, in the county of Silver Bow; that plaintiff entered into an agreement with the Big Hole Lumber Company, a corporation organized under the laws of the state of Montana, whereby

said company entered into the possession of the right of plaintiff to said water, and, with the consent of plaintiff, constructed at great expense a dam across said river, and erected "a mill and flume, by means of which plaintiff used the said water for milling and fluming purposes"; that up to the year 1899 "plaintiff had so made and was making a beneficial use of the water"; and that in said year 1899 the defendant erected a dam and other structures below the place of appropriation by plaintiff, and "caused the water of the said river to back up, overflow and flood plaintiff's dam and millsite, and a portion of the said flume, by reason of which the same have become useless, and cannot be used for the purpose for which they were constructed, to the damage of the plaintiff in the sum of $150,000." The answer denies these allegations, and avers that said Big Hole Lumber Company used and possessed said water of said Big Hole river, and constructed said dam, mill and flume, for its exclusive benefit and without the consent of the plaintiff. The action was tried with a jury, and at the conclusion of the testimony the court granted the motion of the defendant for a nonsuit, and its ruling must be reviewed.

The plaintiff testified that he located the water June 1, 1889, and put up the notice which was received in evidence without objection, to wit:

"Notice is hereby given to all persons concerned, that Frank R. Miles, a citizen of the United States, and a resident of Deer Lodge county, Montana Territory, does hereby claim and intend to appropriate and use the water of the Big Hole river, in Silver Bow county, and territory aforesaid as follows, to wit:

"1st. The number of inches of the waters of the said Big Hole river, claimed by me is five thousand (5,000) inches, to be measured as provided by an Act of the legislative assembly of the territory of Montana, approved March 12, 1885.

"2d. The purpose for which said water is claimed is for driving, milling, smelting, fluming, irrigating, mechanical and all other useful purposes. And the place of intended use is upon section No. 18, township No. 1 south, range 9 west of the principal meridian, Montana Territory.

"3d.   The means of diversion of said water will be by a dam, and flume and ditch.

"4th.   The date of the appropriation is the date of this notice.

"5th.   The name of the appropriator is F. R. Miles.

"6th.   The name of the stream from which the appropriation and diversion of said waters is to be made is as above stated the Big Hole river, and is a tributary of the Jefferson river in Madison county, Montana Territory.

"7th.   The place of appropriation of said water in said Big Hole river will be upon section No. 18, township No. 1 south, range No. 9 west of the principal meridian, Montana Territory. And the point of diversion of said water will be about three and a half miles up said river from Divide Station on the Utah and Northern Railway in Silver Bow county, and below Dewey's Flat, in Beaverhead county and territory aforesaid, and a notice of this claim in writing is posted in a conspicuous place on a stump on the east bank of said Big Hole river at the point of intended diversion. Witness my hand this 1st day of June, 1889.

"FRANK R. MILES."

This notice was duly verified and filed for record June 3, 1889, in the office of the county recorder of the county of Silver Bow.

The plaintiff further testified: "After locating the water, I went over, within the time specified by law, to run out my ditch or flume.   Took a level from my home, and went over there some time in June, after the water was located; and I hired a man to help me carry the rod.   *   *   *   I ran out my line of ditch, and it took me nearly two days to survey my ditch or flume where I intended to divert the water; and it was all because of my agreement with Trask that I did not put my flume in at that time.   Mr. Trask was the general manager of the Big Hole Lumber Company.   *   *   *   As to the manner and by whom the diversion of my water was made: The Big Hole Lumber Company, and Mr. Trask as superintendent

of the company, under his agreement with me, constructed a dam according to my plans on the site I had located. I ran my ditch on the Silver Bow side of the river, * * * and the dam was constructed according to my plans, and the water was diverted; and he took me there afterwards to show me that he had complied with all the conditions of our agreement. As to the agreement I had with Trask: When I was there surveying the ditch, he came down the river from Dewey's Flat, or from his operations below on the river some place, and he asked me if I was going to represent my water right, and I told him that I certainly was. * * * He said there was not water enough there to cover both locations, and he says, 'There is only about timber enough to last four or five years, and we will be through with it, and the water is yours'; and under that agreement I drew the plans, and the dam was built according to these plans, and he carried out his agreement with me. * * * The water was used under this agreement by the Big Hole Lumber Company. They constructed a dam, built a flume, and they moved the mill from the lower dam, and allowed the lower dam to wash out, and paid no attention to it. They used it until I went to the Klondike in 1897. I saw Mr. Trask at that time, and he was acting on there the same as before. I made this arrangement with the Big Hole Lumber Company through Trask, in June, 1889, the same year I located the water. Mr. Trask had succeeded me as superintendent of the Big Hole Lumber Company in April previous. * * * A man by the name of Frank Horton helped me survey the ditch. * * * The flume was between two and two and a half miles long. * * * There was five thousand inches of water diverted and used by the Big Hole Lumber Company under my appropriation and agreement with Trask. * * * I first learned that the Big Hole Lumber Company had quit up there when I returned from the Klondike in 1899. I learned that the Big Hole Lumber Company had sold out, and I made inquiry about my water right. I asked Mr. Trask what had become of my water right, and he said. * * * He told me that W. A. Clark had sold my water right with the balance of the outfit.

I learned that other parties that he had sold to had constructed a dam, and I learned that the firm of Winters, Parsons & Boomer were the contractors that put up this dam; and I went over to Mr. Winter's office for information, and he told me that they had constructed a dam, and where they had constructed it—that it had flooded the old Big Hole Lumber Company dam. * * * What I mean by saying the old dam had been flooded is that the new dam was so much higher than the old one that it had overflowed it. I have seen the new dam recently. * * * On the very same location that I located that dam was built, and covers the other dam, * * * I never made any conveyance of my right, to my recollection. The Butte Electric and Power Company, the defendant in this case, is using the water now. * * * The defendant's use of the water has rendered my point of diversion absolutely useless— destroyed it. The water is so high I couldn't get down to where I made my location. They control it with their dam. They can lower the water. They control it, and I couldn't get to my point of diversion; that is, the crown of the old dam. It is about forty feet under water. * * * After Trask quit using the water I didn't do anything toward using it, except bring this suit. * * * Q. What was your intention in location and appropriating this water? * * * A. My intention was that, knowing that a good location was wanted for a smelter site, to hold it for that purpose. * * * I consider that my damages are reasonably worth the amount of $150,000, taking into consideration the value of that location."

On cross-examination the plaintiff testified: "We chained out and staked the line of the ditch. Didn't make any record of the fact of running this ditch, or put it in writing, any further than to keep an account of the distance chained—just an account of the number of chains. Didn't file any record anywhere of the millsite, or reduce to any writing this survey, nor of the damsite, except what appears of record in the location of the water right. * * * At the time I made this location and filed the notice I was engaged in business at home on the ranch. Had no other business but ranching. It was in the

Deer Lodge Valley. It was about thirty miles from this water location. It would not be forty-five miles from the ranch, because you would not have to come to Butte. In my notice I state that I intend to divert the water on the east side of the river. I did not, nor did the Big Hole Lumber Company, divert the water on the east side. * * * After making the survey and locating the damsite I drew the plans for the dam. I delivered them to Mr. Trask and his foreman, Mr. Sharp. * * * I submitted them to Mr. Trask. I did not draw them at his request. I submitted them to him because that was the style of a dam to go in there—that I wanted them to put in on that location. * * * I found out from Mr. Trask that the Big Hole Lumber Company wanted to build a dam there. * * * It was the first dam constructed on that particular site after I made my location, and the only one that used the water covered by my location. After the dam was completed I did not do anything with reference to the water right, except to go out there on one or two occasions. The first time I went out there was in the fall of 1889. That was the time the dam was in course of construction by the Big Hole Lumber Company. I did nothing except to instruct Mr. Sharp, the foreman, in regard to how the gates should be put in. * * * It was at this time that I stopped, in passing up the river, in Senator Clark's employ, and gave them instructions with reference to the gates. * * * Mr. Trask was the only man I dealt with, so far as the Big Hole Lumber Company is concerned, in making my agreement. I dealt with him as superintendent. That agreement was not in writing. * * * The agreement, as near as I can remember, was when I was making the survey. Mr. Trask came down the river. He had been up looking after the business of the company, and he came down to the bridge, and he says, 'Do you intend to represent your water right?' and I says, 'I do.' 'Well,' he says, 'there is not enough here to cover both locations'; and he says, 'I want this water to build a dam here, and take a flume out, and get my wood in poles.' * * * As to my business since 1889, from June 1st: In 1890, I went to Great Falls to look the

river over to see how it would do to drive lumber, and I cruised the country that summer with a pack train, looking for timber, and I made my report on that in August, 1890; and we then organized what is known as the B. & M. Commercial Company. That was a Boston company; they were operating on the Missouri river and Sheep creek, at Great Falls and in the Flathead country. I went to Great Falls in 1890, but my home was in the Deer Lodge Valley. I went to the Flathead in 1891, or rather late in the fall of 1890. I remember that you went over the reservation with me the first time that I came there, in the fall of 1890. I lived in the Flathead until 1897. Then I went to the Klondike, in July, I believe. I left here in August, 1897, and came back in July, 1899, if I do not mistake. From 1890 to the present time I have only had Mr. Trask in the Big Hole country looking after my interests there, under my agreement with him. I don't remember when he died. I know I saw him there after I came back from the Klondike in 1899. I went back to the Klondike two or three times since, and I think Mr. Trask was out there when I was out there. After 1890, I next visited the Big Hole river in 1895, I think it was. I went over there to look at a spur— to refresh my recollection in regard to some litigation that Jeff Lavell had with the Union Pacific Railroad. They wanted me for a witness. * * * I visited the Big Hole river next when I took these photographs, May 21, 1903. That was a couple of weeks ago—since the commencement of this suit. * * * I owned this water out there. That is the only business I had there, and the only thing I had—the only property rights. Since 1889 to the present time, the only property I ever had in the Big Hole was this water right. I have had no business out there except to be there in 1890, where this dam was constructed. * * * I have ascertained the fact that on or about 1893 it was sold by the sheriff—that is, the assets of the Big Hole Lumber Company—and bid in by W. A. Clark & Bro., but I didn't know it at that time. * * * I learned that he attached the Big Hole Lumber Company. I didn't know that it included this water right. I never looked up the

records to see, because I didn't know what right Mr. Clark had to attach a water right of mine and sell it for an indebtedness of the Big Hole Lumber Company. * * * If the water was diverted on the west side, it would be in Beaverhead county. I have no recollection of ever filing a notice in Beaverhead county. I would recollect it if I had. Under the Trask dam built by the Big Hole Lumber Company, the diversion was made on the Beaverhead side, in Beaverhead county, because of the chances of less damage. I was aware that my location called for a diversion on the Silver Bow county side. So far as your questions are concerned, I think I have told everything I have done in connection with this water right; that is, the work of the actual appropriation of the water."

Frank Horton testified: "I know Mr. Miles. Knew him in June, 1889, when I went to work for him. That was the first that I had ever seen him. We surveyed for him a ditch—I suppose, a water ditch. It was in June, 1889. I was packing the rod. What he told me to do, I done. We worked two days—pretty nearly two days. We commenced in the morning one day, and got through the next day, I think between 3 and 4 o'clock. * * * I heard a conversation between Mr. Miles and Mr. Trask at that time. They were standing on the little bridge, where Mr. Miles and Mr. Trask were talking together. I heard some of their talk. I heard them talking about the water ditch, and about where they were going to take the water out, and where they were going to carry it. * * * In making the survey I carried the rod. I can't say how far we run the line, but I think two and a half or three miles; on the Silver Bow side of the river. It was in June."

The plaintiff was recalled and testified: "The water was taken out on the Beaverhead side of the river, and was run down on that side, and across to the same locality in which I had surveyed my ditch on the Silver Bow side. Run across to the same ground. It crossed the river on the piers and through a flume, and dumped on the same ground that I had made my ditch to—that I made the line of the ditch to. I surveyed the line, but it was not on my ground. I had a filing there once,

but I released it.  I never got title to any part of the ground.
The ground that I filed on is probably between a half and three-
quarters of a mile from the line of the ditch.  I believe Mr.
Lavell owns the ground there.  I released my right in his favor.
I released my right about 1891 or 1890.  Am not positive.  I
believe Mr. Partride owned the ground where the flume was
situated.  I never had any property on the Big Hole river,
since I released my timber-culture claim, except this water
right."

The plaintiff rested, and the defendant filed a motion for
nonsuit upon the following grounds, to wit: 1. That all of the
testimony introduced by the plaintiff fails to show any valid
appropriation of any water of the Big Hole river by plaintiff.
2. That all the testimony introduced by the plaintiff fails to
show that said water right was appurtenant to any beneficial
use, or that the plaintiff ever had or has now any beneficial use
for said water, or any part of it, or that the plaintiff has ever
diverted or used any portion of the said water of the said Big
Hole river, or would be able to now, or at the time of the com-
mencement of this suit, to use any part or portion of the water
of the said Big Hole river for any beneficial purpose, and fails
to show that the alleged use on the part of the defendant of the
water of the Big Hole river in any manner interferes with the
use of said water by the plaintiff.  3. Testimony on the part of
the plaintiff fails to show that he ever held actual possession of
the said water covered by said notice of appropriation intro-
duced in evidence, or that the defendant has in any manner
interfered with plaintiff's use thereof.  4. The evidence in-
troduced by plaintiff fails to show any diligence on the part of
plaintiff in appropriation or using said waters, and that his
claim thereto is inequitable and stale, and constitutes abandon-
ment on the part of plaintiff.

The following sections of the fifth division of the Compiled
Statutes of 1887 governed the appropriation of water in the
territory at the time the plaintiff filed his notice:

"Sec. 1250.  The right to the use of running water flowing

in the rivers, streams, canyons and ravines of this territory, may be acquired by appropriation.

"Sec. 1251. The appropriation must be for some useful or beneficial purpose, and when the appropriator or his successor in interest abandons and ceases to use the water for such purpose the right ceases; but questions of abandonment shall be questions of fact, and shall be determined as other questions of fact."

"Sec. 1256. Within forty days after posting such notice the appropriator must proceed to prosecute the excavation or construction of the work by which the water appropriated is to be diverted, and must prosecute the same with reasonable diligence to completion  *  *  *.

"Sec. 1257. A failure to comply with the provisions of this chapter deprives the appropriator of the right to the use of water as against a subsequent claimant who complies therewith, but by complying with the provisions of this act, the right to the use of the water shall relate back to the date of posting the notice."

The notice may be treated as a compliance with section 1255 of this division, prescribing the statements to be made by the appropriator. The sections *supra* are the embodiment of the decisions of the courts. In *Columbia Min. Co.* v. *Holter,* 1 Mont. 296, the court said: "An intention to appropriate water, to be effectual as against other parties, must be carried into actual execution with all reasonable diligence, by some known and tangible means, and at some designated point. By appropriation a man acquires only the right of possession and user of water, qualified by the right of others to its use, in such manner as shall not materially diminish or deteriorate it, at the place of his appropriation, in quantity or quality. A declaration of a claim to water, unaccompanied by acts of possession, is wholly inoperative as against those who shall legally proceed to acquire a right to the same." The supreme court of the United States, in *Basey et al.* v. *Gallagher,* 20 Wall. 670, 22 L. Ed. 452, affirmed *Gallagher* v. *Basey,* 1 Mont. 457, and said: "Ever since that decision [*Tartar* v. *Spring Creek Water & Min. Co.,* 5 Cal. 396] it has been held generally throughout the Pacific states and terri-

tories that the right to water by prior appropriation for any beneficial purpose is entitled to protection." Section 1251, *supra,* was construed by the supreme court of the territory prior to the filing of the notice by plaintiff, in *Tucker* v. *Jones,* 8 Mont. 225, 19 Pac. 571, and the court said: "Now, if they had no land, or legal possession of the land, they had nothing for which they could appropriate the water. So, if Pierce and Durham did not have any possessory rights or interest in these public lands, they could not make any lawful appropriation, and an attempt to do so would be nugatory." The Civil Code, enacted in 1895, retains the sections *supra.* In *Power* v. *Switzer,* 21 Mont. 523, 55 Pac. 32, the court said: "It has been a mistaken idea in the minds of many, not familiar with the controlling principles applicable to the use of water in arid sections, that he who has diverted, or 'claimed' and filed a claim of, water for any number of given inches, has thereby acquired a valid right, good as against all subsequent persons. But, as the settlement of the country has advanced, the great value of the use of water has become more and more apparent. Legislation and judicial exposition have, accordingly, proceeded with increasing caution to restrict appropriations to spheres of usefulness and beneficial purposes. * * * The intention of the claimant is therefore a most important factor in determining the validity of an appropriation of water." In *Toohey* v. *Campbell,* 24 Mont. 13, 60 Pac. 396, the court said: "One of the rules in the system of the law of water rights is that no one man can, by prior appropriation, obtain exclusive control of an entire stream, unless his appropriation is made for some beneficial purpose, presently existing or contemplated. * * * But, as every appropriation must be made for a beneficial or useful purpose (section 1881, Civil Code), it becomes the duty of the courts to try the question of the claimant's intent by his acts and the circumstances surrounding his possession of the water, its actual or contemplated use and the purposes thereof." (See, also, *Smith* v. *Denniff,* 24 Mont. 20, 81 Am. St. Rep. 408, 40 Pac. 398.)

The testimony shows that the plaintiff failed to comply with the law in force in the year 1889 regulating the appropriation

of the right to the use of running water in the rivers of the territory. From June, 1889, until this action was commenced, in 1902, the plaintiff did not divert the water he claims to have appropriated, or construct any dam, ditch, flume, or work of any kind to convey the water to any place for a beneficial purpose. The plaintiff never owned or possessed said section 18 described in the notice, or any mine, mill, smelter, ranch, or property to which said water right was appurtenant, and upon which the water could be utilized. During this long period the plaintiff lived and was engaged in business at remote localities, and, after said notice was filed, made only two visits to the Big Hole river—one for W. A. Clark in the fall of 1889, and the other for Jeff Lavell in 1895. No contract in writing was made with any officer of the Big Hole Lumber Company by which said water right was possessed and enjoyed by the corporation, and under the terms of which the company held for the use and benefit of plaintiff, even if this arrangement could have been made. The plaintiff did not own or possess any share in the business or property of the Big Hole Lumber Company, and did not use or possess, and there was no agreement that he should use or possess, its dam, flume, mill or other property. The assets of the Big Hole Lumber Company were disposed of in 1893 at a sheriff's sale to W. A. Clark & Bro., and plaintiff did not "look up to the records to see," but was told by Trask that said water right was sold with the rest. The plaintiff made no protest, and did not resort to the courts to vindicate his claim from the consequences of this sale. The notice was posted "on a stump on the east bank of said Big Hole river at the point of intended diversion," and the plaintiff made his survey for a ditch therefrom; but the water was diverted on the west bank by said dam, ditch and flume of the Big Hole Lumber Company, in the county of Beaverhead. The plaintiff did not post or file in the office of the county recorder of the county of Beaverhead a notice claiming the right to said water. This reference to the testimony will be concluded by a repetition of the answer of the plaintiff to the question: "What was your intention in location and appropriating this water?" "My intention was that, knowing that a

good location was wanted for a smelter-site, to hold it for that purpose." The court, in *Nevada County & Sacramento Canal Co.* v. *Kidd et al.,* 37 Cal. 282, states the law applicable to this case. "Until a claimant is himself in position to use the water, the right to the water, or water right, does not exist in such sense that the mere diversion and use of the water by another, is a ground of action either to recover the water, or for damages for the diversion. This is clearly the result of the decision in *Kimball* v. *Gearhart,* 12 Cal. 29 * * *. Diligence in following up the work, and a presumed pecuniary ability to complete it, are also mentioned as elements necessary to entitle the party to connect his right upon a final actual appropriation with the first act manifesting an intent to appropriate, for the purpose of giving priority over a prior actual appropriation by other parties in good faith, by acts subsequently commenced."

The motion for nonsuit was justly sustained. We recommend that the judgment appealed from be affirmed.

PER CURIAM.—For the reasons stated in the foregoing opinion, the judgment is affirmed.

*Affirmed.*