SMITH ET AL., RESPONDENTS, *v.* DUFF ET AL., DEFENDANTS; HOSSFELD AGRICULTURAL & STOCKRAISING CO. ET AL., APPELLANTS.

(No. 2,608.)

(Submitted April 12, 1909. Decided July 3, 1909.)

[102 Pac. 984.]

*Waters and Water Rights — Appropriation — Validity — How Determined — Development of Water — Evidence — Insufficiency.*

Waters—Appropriation—Validity—How Determined.

1. In determining the validity of an appropriation of water, the claimant's intent, judged by his acts, the circumstances surrounding his possession of the water, its actual or contemplated use, and the purposes thereof, are important factors.

Same—Rights of Appropriators.

2.   A subsequent appropriator in a stream is entitled to have the water flow in the same manner as when he located, and he may insist that one prior to him shall be confined to what he actually appropriated or what is necessary for the purposes for which he intended to use the water.

Same—Appropriation—Evidence—Insufficiency—Remand.

3.   Where the evidence in a water right suit failed to disclose what maximum amount of land respondent's predecessor in interest had irrigated, how much water he used or when he used it for irrigating purposes, what his intentions were when making his appropriation, or the character of his land, the capacity of his ditch, or how soon he carried out his intentions and to what extent, or what diligence he exercised in carrying them out, the supreme court will not enter a final judgment, but remand the cause for further proceedings.

Same—Subsurface Supply—Part of Stream.

4.   The subsurface supply of a stream, whether coming from tributary swamps or running in the sand and gravel constituting its bed, is as much a part of the stream as is the surface flow, and is governed by the same rules.

Same—Development of Water—Burden of Proof.

5.   One who based his right to the exclusive use of water upon an alleged development of a supply had the burden of proving that in developing it he did not intercept water to which others were rightfully entitled.

Same—Development of Water—Rule not Applicable, When.

6.   The rule that one who develops a new supply of water is entitled to its exclusive use has no application to the mere removal of obstructions in, or the hastening of the flow of, a stream; nor does it apply to the draining of a swamp which has a natural outlet and feeds a stream, in the undiminished flow of which others have prior rights.

Same—Development of Water—Evidence—Insufficiency.

7.   Evidence *held* insufficient to warrant a finding of the court that respondents in a water right suit were entitled to the exclusive use of certain water because developed by them.

*Appeal from District Court, Broadwater County; W. R. C. Stewart, Judge.*

SUIT by Joseph E. Smith and another against A. T. Duff and others, and from the decree determining water rights defendants, Hossfeld Agricultural & Stockraising Co., and others appeal.   Reversed and remanded.

*Mr. C. B. Nolan,* for Appellants.

To constitute a valid appropriation of water, three elements must always exist: First, the intent to apply to some beneficial use, existing at the time or contemplated in the future; second, a diversion from the natural channel by means of a ditch, canal

or other structure; and third, an application of it within a reasonable time, to some beneficial industry. (*Nevada Ditch Co. v. Bennett,* 60 Am. St. Rep. 802 (extended note); *Low* v. *Rizor,* 25 Or. 551, 37 Pac. 82; *Power* v. *Switzer,* 21 Mont. 530, 55 Pac. 32; *Toohey* v. *Campbell,* 24 Mont. 17, 60 Pac. 396; see, also, *Miles* v. *Butte Electric Co.,* 32 Mont. 67, 79 Pac. 549; 18 Am. & Eng. Ency. of Law, 2d ed., p. 498; *Combs* v. *Agricultural Ditch Co.,* 17 Colo. 146, 31 Am. St. Rep. 275, 28 Pac. 966.) Another proposition, which seems to be axiomatic, is, that the prior appropriator cannot increase his demands so as to deprive a subsequent appropriator of his rights acquired before such increased demands and use. (*Becker* v. *Marble Creek Irr. Co.,* 15 Utah, 225, 49 Pac. 892; *Hague* v. *Nephi Irr. Co.,* 16 Utah, 421, 67 Am. St. Rep. 634, 52 Pac. 765, 41 L. R. A. 311; *Ramelli* v. *Irish,* 96 Cal. 214, 31 Pac. 41; *Hargrave* v. *Cook,* 108 Cal. 80, 41 Pac. 18, 30 L. R. A. 390; *Strickler* v. *City of Colorado Springs,* 16 Colo. 61, 25 Am. St. Rep. 248, 26 Pac. 313; *Last Chance Min. Co.* v. *Bunker Hill Min. Co.,* 49 Fed. 433.) The law is likewise too well settled to need citation of authorities, that the use cannot be enlarged to the detriment of a junior appropriator. (*Powers* v. *Switzer, supra; Union Min. Co.* v. *Dangberg,* 81 Fed. 73.)

Under the pleadings there was no authority for a finding in favor of developed water. A party is bound to recover, if at all, upon the causes of action alleged, and not upon some separate and distinct cause of action which may be disclosed by the evidence. (*Booth* v. *Farmers' Nat. Bank,* 47 Or. 299, 83 Pac. 785.) And a finding of fact outside the issues made by the pleadings is a mere nullity and will not sustain the judgment. (*Male* v. *Shaut,* 41 Or. 425, 69 Pac. 137; *Gamache* v. *South School Dist.,* 133 Cal. 145, 65 Pac. 301; 8 Ency. of Pl. & Pr., p. 944; *Harris* v. *Lloyd,* 11 Mont. 390, 28 Am. St. Rep. 475, 28 Pac. 736.)

*Mr. George F. Cowan,* for Respondents.

The right to change the use, as well as the place of use, of appropriated running water, where the established rights of

others are not interfered with, is well established. (Revised Codes, sec. 4842; Pomeroy on Riparian Rights, sec. 65; *Fabian* v. *Collins*, 2 Mont. 515; *Davis* v. *Gale*, 32 Cal. 27, 91 Am. Dec. 554.)

That developed water is the absolute and exclusive property of the person who develops it, and that it is not subject to appropriation by any other person, is well settled. The right to appropriate water extends only to water flowing in rivers, streams, canyons and ravines. (Revised Codes, sec. 4840; *Beaverhead Canal Co.* v. *Dillon E. L. & P.*, 34 Mont. 135, 85 Pac. 880; *Davis* v. *Spaulding*, 157 Mass. 431, 32 N. E. 650, 19 L. R. A. 102; *Wheatly* v. *Baugh*, 25 Pa. 528, 64 Am. Dec. 727; *Herriman Irr. Co.* v. *Keel*, 25 Utah, 96, 69 Pac. 719; *Willow Creek Irr. Co.* v. *Michaelson*, 21 Utah, 248, 81 Am. St. Rep. 687, 60 Pac. 943, 51 L. R. A. 280; *Yarwood* v. *West Los Angeles Water Co.*, 132 Cal. 204, 64 Pac. 275, 19 L. R. A. 92; *Gould* v. *Eaton*, 111 Cal. 639, 52 Am. St. Rep. 201, 44 Pac. 319; *Southern Pac. R. Co.* v. *Dufour*, 95 Cal. 615, 30 Pac. 783, 19 L. R. A. 92; *Crescent Min. Co.* v. *Silver King Min. Co.*, 17 Utah, 444, 70 Am. St. Rep. 810, 54 Pac. 244; *Cardelli* v. *Comstock Tun. Co.*, 26 Nev. 284, 66 Pac. 950; *Meyer* v. *Tacoma Light & Water Co.*, 8 Wash. 144, 35 Pac. 601; *Mosier* v. *Caldwell*, 7 Nev. 363; *Swett* v. *Cutts*, 50 N. H. 439, 9 Am. Rep. 276; *Elster* v. *City of Springfield*, 49 Ohio St. 82, 30 N. E. 278; *Metcalf* v. *Nelson*, 8 S. D. 87, 59 Am. St. Rep. 746, 65 N. W. 911; *Hanson* v. *McCue*, 42 Cal. 303, 10 Am. Rep. 299.)

HONORABLE LLEWELLYN L. CALLAWAY, Judge of the Fifth Judicial District, sitting in place of MR. JUSTICE SMITH, delivered the opinion of the court.

This controversy, like the last preceding one decided by the court, grows out of the Crow creek water suit. While there were many parties to that suit, the only ones who appear to be affected by this appeal are the Hossfeld Agricultural & Stock-raising Company, the Smith heirs, and Ed. Hossfeld, appellants, and Blondell, Massa, and Rothfus, respondents. We shall refer to these respective parties hereafter as the appellants and respondents. The district court awarded appellants the right to use

512 inches of water diverted from Crow creek as of date May 1, 1885, through a ditch owned by them jointly. The respondents were awarded the right to use 400 inches of the waters of the Willow Swamp as of date May 1, 1872, and the exclusive right to use 160 inches of the waters of the swamp "by reason of water developed" by them. Respondents' waters are diverted through their "Willow Swamp canal." Appellants' ditch taps Crow creek below the mouths of all its tributaries and below the heads of the ditches of all others to the suit. The record indicates that the Willow Swamp discharges its visible waters through Marsh creek naturally; possibly some through Swamp creek. Both are important tributaries of Crow creek. Any diversion which takes the water of either of these streams lessens the quantity flowing in Crow creek; and any diversion which takes away from the swamp water which would flow naturally in either Marsh creek or Swamp creek accomplishes the same result. At the trial counsel for appellants requested the court to find respondents' rights to be later in point of time than those to be awarded the appellants, and that there was no development of water on account of work done in the 'Willow Swamp by the owners of the Willow Swamp canal. The court refused to so find, but found as above stated. The appellants then moved for a new trial, which was denied, whereupon they appealed to this court from the order denying their motion and from the judgment. The respondents have moved to dismiss the appeals upon grounds similar to those lodged against the appeals of Kitto and Williams, and their motion is overruled for like reasons. (*Smith* v. *Duff ante,* p. 374, 102 Pac. 981.)

1. Taking up first the right given respondents as of date May 1, 1872. It seems that four persons commenced to dig the Willow Swamp canal in the spring of 1872. They intended to convey water to a point near the Missouri river for the purpose of placer mining. The canal was completed in 1874, or 1875 probably. It was used for mining only one year, as the gold was so fine it could not be mined profitably. When the canal was constructed it absorbed a ditch belonging to the witness Ross, which had been dug in 1871. According to his statement the

diggers of the canal used the water it diverted in subordination to the right he claimed. He had been irrigating about fifteen acres by means of his ditch. It seems from his testimony—and he is the only witness who gave any direct testimony on the subject—that these men intended to use water only in the spring and fall when it was not needed by others for irrigation. They did not claim, nor did they intend to use, any water for irrigation; nor did either of them ever use any for that purpose, with the exception of MacFarlane, who possessed a small ranch and cultivated a garden. He may have irrigated ten or twelve acres. Ross diverted what water he needed from the canal at pleasure. He seems to have been recognized as an owner in it. After its completion the greatest amount of land he farmed in any year was eighty acres, but in what year this was done it is not possible to say from the record. He further testified that after the completion of the canal the only water from it which was used for irrigation was what was used by himself and MacFarlane. How comprehensive this last statement was intended to be we do not know. The witness Macomber's recollection is that the water was used first on the lands owned by respondents as early as 1880, but he would not testify positively to that. He did not give any information as to the amount of land irrigated, nor as to the quantity of water used. It is fairly deducible from the record that no greater quantity of water than that testified to by Ross as having been used by himself and MacFarlane was used by respondents or their predecessors in interest prior to 1895, which was long after the appropriation of appellants.

It is apparent from this testimony that the only rights which should be awarded respondents superior to appellants are those based upon the appropriations of Ross and MacFarlane. Not by any construction may respondents succeed to the so-called appropriation for mining, and use it for agriculture under the conditions above set forth.

The intention of the claimant is an important factor in determining the validity of an appropriation of water. "When that is ascertained, limitation of the quantity of water necessary

to effectuate his intent can be applied according to the acts, diligence, and needs of the appropriator." (*Power* v. *Switzer*, 21 Mont. 523, 55 Pac. 32.) "As every appropriation must be made for a beneficial or useful purpose, it becomes the duty of the courts to try the question of the claimant's intent by his acts and the circumstances surrounding his possession of the water, its actual or contemplated use and the purposes thereof." (*Toohey* v. *Campbell*, 24 Mont. 13, 60 Pac. 396; *Miles* v. *Butte Electric & Power Co.*, 32 Mont. 56, 79 Pac. 549.)

It seems that prior to 1893, when the respondent Massa bought the MacFarlane holdings, not to exceed twelve acres had been irrigated by his predecessors in interest. Taking the most favorable view of that right, then, it should be allowed water sufficient to irrigate that amount of land; but we are unable to say from the evidence the quantity which should be fixed as determining the right, without resorting to conjecture. We are not informed as to the character of the land through which the ditch runs after leaving Marsh creek, nor its length from that point to the place of use. We do not desire to guess as to the quantity of water lost by seepage and evaporation as it passes through the ditch, nor as to the quantity required to irrigate those twelve acres of land.

As above noted, the record does not show when Ross irrigated his maximum amount of land; whether it was before or after appellants' appropriation. What were his intentions when he made his appropriation? How large was his ditch? How much land did he possess, and how much did he contemplate using the water upon? How soon did he carry out his contemplated use, and to what extent? What diligence did he employ? These questions, too, we are compelled to leave unanswered.

It is said in *McDonald* v. *Lannen*, 19 Mont. 78, 47 Pac. 648: "The test of the extent of an appropriation with reference to a subsequent right to the waters of a stream is dependent upon the capacity of the first ditch before such subsequent appropriation is made. When an owner or possessor of land makes an appropriation of water in excess of the needs of the particular portion of the land upon which he conveys the water, and other

portions of his land also require irrigation, his water right is not limited by the requirements of the particular fraction. He may still, despite the fact that another's water right has attached, construct other ditches through his remaining land, provided that the total amount of water conveyed by all the ditches on his place does not exceed the original capacity of the first ditch. As between his appropriation and the subsequent water right, the capacity of the ditch by means of which he first made his appropriation is the test of the extent of it." In using the language above quoted, we think the court did not mean to imply, as a rule of universal application, that an appropriator is entitled to all the water which will flow in his ditch at the time a subsequent appropriation is made by another. The prior appropriator will not be permitted to claim more than his ditch will carry; he may be, and usually is, limited to less. The time when the first appropriator dug his ditch, his diligence in applying the water to a beneficial use, the extent of the use made by him, his needs, and the circumstances surrounding all these acts, are to be considered in determining the amount which he is entitled to in preference to the subsequent appropriator. As illustrative of this: If MacFarlane had been the sole owner of the canal, which had a carrying capacity of 400 inches when appellants made their appropriation, and yet for twenty years prior to appellants' appropriation he had never irrigated in excess of twelve acres of land, his prior right would be confined to enough water to irrigate that land. The court would say that was all he ever intended to use, deducing his intentions from his acts during that long period of time. One is not permitted to obtain the exclusive control of an entire stream by appropriation "unless his appropriation is made for some beneficial purpose, presently existing or contemplated." (*Toohey v. Campbell, supra.*) A subsequent appropriator is entitled to have the water flow in the same manner as when he located, and "he may insist that prior appropriators shall be confined to what was actually appropriated or necessary for the purposes for which they intended to use the water." (*Spokane Ranch &*

*Water Co.* v. *Beatty et al.*, 37 Mont. 342, 96 Pac. 727, 97 Pac. 838. and authorities cited.)

A final conclusion of this case by this court would be based, not only upon conjecture to a considerable extent, but also upon the assumption that there is no evidence obtainable upon which to adjudge rightly the Ross and MacFarlane rights. The paucity of facts to sustain their rights is attributable to respondents, and probably they could not be heard to complain if we should pass a final judgment upon the record as it stands. However, we think the interests of justice will be subserved best by giving them and their adversaries, the appellants, an opportunity to dissipate the mist which permeates this record now, and have concluded to remand the case for further proceedings.

2. As to the developed water: The court found the respondents to be entitled to the use of 160 inches of the waters of the Willow Swamp "as against every other party to this suit by reason of water developed by said defendants by the draining of said Willow Swamp by the Willow Swamp canal."

From the map in evidence it seems that Willow Swamp covers an area of approximately a square mile. Further than this the record furnishes us with little information as to its character. It is referred to simply as a swamp. The so-called original channel of Swamp creek passes through a portion of it. Marsh creek is "the child of the swamp." Whatever water it has produced in the course of nature undoubtedly is tributary to Crow creek. Whether the water which saturates the swamp comes from subterranean springs, or through percolation from higher adjacent lands, or whether it is in part supplied by a subsurface flow in the bed of the original channel of Swamp creek or in the lands adjacent thereto, we are not advised. Neither are we informed as to its surface flow during different periods of the year, except in the instances hereinafter referred to. It must not be forgotten that the subsurface supply of a stream, whether it comes from tributary swamps or runs in the sand and gravel constituting the bed of the stream, is as much a part of the stream as is the surface flow and is governed by the same rules. (*Buckers I. M. & I. Co.* v. *Farmers' Independent Ditch Co.*, 31

Colo. 62, 72 Pac. 49; *Howcroft* v. *Union & Jordan I. Co.*, 25 Utah, 311, 71 Pac. 487.) These inquiries are pertinent, for if the respondents have not added to the waters natural to Crow creek, they may not take any of them to the deprivation of prior appropriators. If by their own exertions they have developed a supply of water theretofore not a part of the waters of Crow creek and not before available to the users of the stream, they have the first right to take and use such increase. (*Beaverhead Canal Co.* v. *Dillon Electric L. & P. Co.*, 34 Mont. 135, 85 Pac. 880.) "It is only the actual increase resulting from the addition of water to a natural stream which would not otherwise pass down either its surface or subterranean channel to the benefit of other prior appropriators which the law recognizes as an increase of that character which can be diverted as against those entitled to its natural flow." (*Buckers I. M. & I. Co.* v. *Farmers' Independent Ditch Co., supra.*)

Whoso asserts that he is entitled to the exclusive use of water by reason of its development by him must assure the court by satisfactory proof that he is not intercepting the supply to which his neighbor is rightly entitled. Thus the burden was on the respondents to prove that they developed the 160 inches of water awarded them by the court in addition to the natural supply of Crow creek (*Howcroft* v. *Union & Jordan I. Co., supra; La Jara Creamery & L. S. A.* v. *Hansen*, 35 Colo. 105, 83 Pac. 644) ; this proof necessarily would have given assurance that in taking the alleged new supply they did not diminish the quantity of the principal stream. We recognize the difficulty of making proof in cases like this, and have searched the record carefully to see if respondents produced evidence to substantiate the court's findings, but we have searched in vain.

The Willow Swamp canal commences near the head of the swamp, runs through it, occupies the bed of Marsh creek for a short distance, and then proceeds to the ranches of respondents. In October, 1895, the respondents began to run lateral ditches from the canal toward the head of the swamp, and the work was completed September 30, 1896. How much work was done

the record does not show. One of them, Massa, says it increased the flow in the canal about half. Whether this was a perma- nent increase is left to conjecture. The proof is not of such a character as to permit the indulgence of the presumption "that a thing once proved to exist continues as long as is usual with things of that nature." (Revised Codes, sec. 7962, subd. 32.) The witness Macomber made measurements of the water run- ning in the canal both before and after the work. In Septem- ber, 1895, he found 324 inches, and on October 30, 1896, 513 inches flowing therein. He says there was "quite a good rain" before the measurement of 1895 and "a couple of pretty good rains" before that of 1896, and that rain affects the swamp; "the water raises to the top of the ground as quick as there is rain." He said he could not tell whether the difference in the two measurements was due to work done or to rain, and that he did not know the supplying agencies of the swamp, but that irrigation on the land above has a tendency to increase its waters. Where the lateral ditch ran into his field it was "one spade deep" and probably two feet wide. No other dimensions of laterals are given. The witness Ross testified that lateral ditches were run in the swamp "to increase the water" as early as 1879 or 1880, but whether this work effected any permanent increase is also conjectural.

In August, 1906, 168 inches of water flowed in the canal above, and 182 inches below, its junction with Marsh creek. The last point mentioned seems to be the point where Macomber made his measurements. This indicates that the water produced by the swamp has decreased very materially since 1896, or that it produces more water in the fall than it does in the summer. If the latter supposition be true, it is consistent with the testi- mony of Macomber, who is of the opinion that the swamp is largely supplied by water from the irrigation of lands above. It is a matter of common knowledge that the flow from irrigated lands is heaviest in the fall.

It is questionable whether the running of the laterals did more than to facilitate the outlet of the surface waters with which the swamp was saturated. Removing obstructions and making easy

the flow of water would increase the output for a time undoubtedly, but this does not even imply that such work has tended to develop water. "The rule does not apply to mere removal of obstructions or hastening of flow, so that the actual amount of water which passes along the stream is not increased, but only to cases in which a supply of water is added to the stream which would not otherwise have flowed there." (*Beaverhead Canal Co.* v. *Dillon Electric L. & P. Co., supra.* It is readily appreciated that where waters are impounded, as for instance in a swamp, with no natural means of escape, and one, by work done, releases them and provides a permanent supply of water for use which had theretofore not been available, he may be said to have developed the water. This is quite a different matter from draining a swamp. Draining a swamp exhausts it and causes it to dry up, and this the use of the word "drain" necessarily implies.

The record is absolutely barren of testimony indicating that the respondents through their exertions have added a single drop to the waters of Crow creek. It is possible, upon a further hearing of this phase of the case, that respondents will be able to establish as a fact that they have developed water in the Willow Swamp. Before proceeding further, however, they should ask permission of the lower court to amend their answers to warrant the reception of evidence upon that feature of the case.

The judgment is reversed and the cause is remanded. The district court of Broadwater county is directed to make findings respecting the rights of appellants and respondents in accordance with the views expressed in this opinion, upon the evidence already in the record, and such other evidence as the parties may be able to furnish the court upon the points at issue.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

MR. JUSTICE SMITH, being disqualified, did not hear the argument, and takes no part in the foregoing decision.