.ALLENDALE IRRIGATION CO., Appellant, *v.* STATE
WATER CONSERVATION BOARD et al., Respondents.

(No. 8,250.)

(Submitted February 16, 1942.   Decided June 27, 1942.)

[127 Pac. (2d) 227.]

Mr. W. E. Keeley and Mr. James B. Castles, for Appellant, submitted an original brief, two reply briefs and a supplemental brief, and argued the cause orally.

Mr. John W. Bonner, Attorney General, Mr. C. J. Dousman, Counsel for the State Water Conservation Board, and Mr. S. P. Wilson, for Respondents, submitted an original and a reply brief; Mr. Bonner and Mr. Dousman argued the cause orally.

438

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Plaintiff appeals from a decree for defendant in an injunction suit. On July 8, 1939, plaintiff filed a complaint alleging, among other things, "that on or about the 1st day of July, 1939, when there was less than 2,000 miners' inches of water available from water flowing in Flint Creek for diversion" into the Allendale canal, and at all times since that date, the defendant State Water Conservation Board had caused plaintiff and its stockholders to be deprived of irrigation water which they greatly needed and would otherwise have received; that on July 1st 1,100 miners' inches of water had been diverted into the ditch and at all times since there had been from 1,100 to 1,700 miners' inches flowing therein; that it all constituted natural flow of Flint Creek and not reservoired water, and that plaintiff's stockholders had the right to use all of such natural flow water to an amount not exceeding 2,000 inches. The prayer was for a restraining order and a permanent injunction restraining defendants from interfering with plaintiff's rights and "from diverting water from said Allendale ditch or canal for sale as reservoired water when there is less than 2,000 miners' inches of water entering said ditch or canal, at all times that the defendants are unable to show that water from said reservoir, and not the natural flow of said Flint Creek or its tributaries, is placed in said Flint Creek above the head of the Allendale ditch or canal, in which event, the defendants may sell from the waters in such ditch only so much water as is clearly shown to be water so diverted into Flint Creek from said reservoir, less a reasonable allowance for seepage, evaporation and other losses." It will not be necessary to detail further the allegations of the pleadings.

An order to show cause and restraining order was issued in accordance with the plaintiff's prayer, made returnable on July 17th. On that day it was stipulated that the hearing be continued until October 16th and that the restraining order be modified to permit the water pending trial to be distributed

between the parties by the water commissioners under the court's instructions. No ruling was made upon the hearing of October 16th, but the restraining order was continued until trial of the cause.

On May 22, 1941, the trial court rendered findings of fact to the effect that on July 8, 1939, there was no water available in Flint Creek for plaintiff which did not constitute either natural flow needed by prior appropriators or storage water of the defendant Board; that the water delivered into the Allendale canal on that date was not natural flow of Flint Creek but was project water brought by the defendants from Rock Creek; that all water delivered into the Allendale canal between July 8th and July 17th was the defendants' property and that the plaintiff was not entitled to an injunction nor to receive water under the injunction on July 8, 1939, or between July 8th and July 17th, or between July 17th and September 1st, 1939. Conclusions of law in conformity were made at the same time. On May 31, 1941, plaintiff served and filed exceptions to the findings and conclusions but the court, without ruling upon them, entered judgment for defendants on June 2, 1941.

The length of the record, which consists of more than 1,250 pages, together with a great mass of exhibits offered in evidence and certified to this court, much of which is immaterial, has greatly complicated the work of the trial court and of this court and has delayed the disposition of the cause. At this point we shall state only the chief facts.

The defendant State Water Conservation Board has constructed a project for the impounding of waters of the East Fork of Rock Creek and their diversion over the divide into Flint Creek valley for sale to purchasers there. Rock Creek and Flint Creek are separate tributaries of the Clarke's Fork or Missoula River and the Rock Creek water would not otherwise be available in Flint Creek valley except for certain waters theretofore brought over by prior appropriators, which need not be mentioned further. The defendant Flint Creek Water

Users' Association is a corporation organized to purchase water from the Board for distribution to its stockholders.

Prior to April 28, 1937, plaintiff owned an unadjudicated water right to 3,000 inches of the natural flow of Flint Creek, together with the Allendale canal through which the appropriation was delivered to its stockholders. On that date plaintiff conveyed its said canal and water rights to the defendant Board, reserving however the right to the first 2,000 inches of its appropriation together with the right to receive it through the canal, and the defendant Board agreed to deliver to plaintiff water up to that amount whenever available therefor from the natural flow of Flint Creek. Certain of the plaintiff's stockholders and other land owners along or near the Allendale canal have become stockholders of defendant Water Users' Association so as to be able to receive project water by purchase from the defendant Board.

Whether the water in question present in the Allendale canal during the first eight days of July, 1939, or part of it, constituted natural flow of Flint Creek properly available for plaintiff's reserved right under its appropriation of water, or whether it was all project water brought over from Rock Creek watershed by the defendant Board, will be determinative of the chief issue, whether the defendant Board had the right to deprive plaintiff and its stockholders of the water which they admittedly needed for irrigation purposes. There is some discussion whether the plaintiff had paid for certain storage water purchased by it, but that matter has nothing to do with this controversy.

It is well settled that the primary rights to the use of water in a stream are those of appropriators of natural flow and that the burden is upon a subsequent storage claimant (*Donich* v. *Johnson*, 77 Mont. 229, 250 Pac. 963; *Irion* v. *Hyde*, 110 Mont. 570, 105 Pac. (2d) 666) or of one who uses a water course as part of his distribution system of developed or alien waters (*Smith* v. *Duff*, 39 Mont. 382, 102 Pac. 984, 133 Am. St. Rep. 587; *Spaulding* v. *Stone*, 46 Mont. 483, 129 Pac. 327; *Rock*

*Creek Ditch & Flume Co.* v. *Miller,* 93 Mont. 248, 17 Pac. (2d) 1074, 89 A. L. R. 200) affirmatively to disprove his interference with prior rights.

It is our conclusion, not only that the defendants failed to ▉ discharge that burden, but that they affirmatively proved their interference with plaintiff's rights. Certain of the defendants' witnesses testified that in average years no natural flow was available for plaintiff's canal in July, that 1939 was average or below average as to moisture, and that in their opinion the water then available must have been storage water. Indulging the very questionable assumption that in the absence of better evidence such testimony might have constituted a sufficient showing especially with reference to a watershed of the nature and extent of Flint Creek, it was overcome by substantial evidence introduced by the defendants themselves.

One item of defendants' evidence was a sheet of graphs showing a marked relationship between the amount of water brought over the divide by their project and the amount of water in Flint Creek at the Franz or Six-Mile gauge about twenty miles down stream from the divide and about ten miles above the head of the Allendale canal. These graphs indicate a delay of about four days between the water's arrival at the divide and its arrival at the Franz gauge, and it is reasonable to assume that an interval of two days further would intervene before the waters would arrive at the Allendale intake, about half of which would be above the Maxville gauge and the entry of Boulder Creek.

The Franz gauge and the Maxville gauge, another one about five miles below on Flint Creek, are maintained by the Geological Survey, Department of the Interior, and readings of the stream flow for both gauges for the summer of 1939 were placed in evidence. They show that although no streams entered and some diversions were made between the gauges, the lower one showed closely similar flows, those of Franz gauge from June 30th to July 8th in miners' inches being 1,360, 1,120, 1,160, 1,040, 1,120, 1,240, 1,440, 1,360 and 1,720, and those of

the Maxville gauge on the same dates 1,680, 1,320, 1,320, 1,320, 1,320, 1,400, 1,560, 1,360 and 1,520.

A little below the latter gauge and about five miles above the Allendale intake, Boulder Creek enters Flint Creek and its flows on June 30th and the first eight days of July in miners' inches, together with the flows of two smaller creeks intervening, Gird and Byrne Creeks, were 3,070, 2,630, 2,230, 2,230, 2,230, 2,230, 2,220, 2,220 and 1,780. Thus the total flows below the junction on those days, found by adding the figures of the last two gauge readings, were 4,750, 3,950, 3,550, 3,550, 3,550, 3,630, 3,780, 3,580 and 3,300.

Entering the Allendale canal on the first eight days of July, 1939, were flows of 2,249, 1,179, 1,179, 1,120, 1,139, 1,139, 1,492 and 1,322 miners' inches respectively, and in Flint Creek flowing past the Allendale intake on those days were flows of 1,865, 3,000, 2,500, 3,100, 2,580, 2,890, 2,000 and 2,180. Thus the total stream flows at the Allendale intake on those days were 4,114, 4,179, 3,679, 4,220, 3,719, 4,029, 3,492 and 3,502. Thus, although other ditches took water out of the stream in the five-mile interval between the junction of Flint and Boulder Creeks and the Allendale diversion, about one day's flow down stream, there was more water at the latter point on every day except three, than there had been near the junction on the preceding day. The exceptions were July 1st, 7th and 8th, on which the reductions were 646, 288 and 78 miners' inches respectively.

The evidence showed that the water allowed by the commissioner to flow past the Allendale headgate on each day was the amount needed to fill prior appropriators' needs on the stream below after filling like needs above, and that those amounts were ample for the purpose on each day. Thus the amounts allowed to enter the Allendale ditch, not exceeding 2,000 inches, should have been applicable to plaintiff's rights to the extent to which they constituted natural flow and not project water.

For the purpose of determining gain through return flow after use, and to determine also the average daily amounts of

natural flow and of storage water at the Franz gauge during July, 1939, defendants showed an average daily flow over the divide of 62.4 second feet, and an average natural flow of 62 second feet, or a total of 124.4. Against this they showed average daily diversions above the Franz gauge of 36.6 second feet of project water and 104 second feet of natural flow water, or a total of 140.6, which is 16.2 more than the 124.4 which would have been available were it not for return flow. Added to that gain of 16.2 second feet was an average daily flow of 57 second feet at the Franz gauge, making a total of 73.2 second feet more than the 124.4 direct flow, and constituting a reflow of 52.2%. It would seem that not all of the seepage in the stream could have been return flow from the direct flow, since some amount of seepage must have been from springs in the creek bed or percolations through the creek banks directly representing rain and snow run-off. However, as the method of determining the 62 second feet of natural flow was not explained nor inquired into, it may be that in it allowance was made for percolations representing direct flow. We shall therefore accept it as approximately correct for the purposes of this case, as the trial court apparently did. Since of the 140.6 second feet diverted for irrigation use in the upper valley, 36.6 second feet, or 26%, was project water and 104 second feet, or 74%, was natural flow, the defendants' witness applied those percentages to the 73.2 second feet assumed to be return flow, and thereby attributed 19 second feet of the return flow to project water and 54.2 second feet to natural flow, which would seem logical enough.

Adding to the 62.4 second feet of project water brought over the divide, the 19 second feet return flow, and deducting the 36.6 second feet sold in the upper valley, the witness found that 44.8 second feet of the project water remained at the Franz gauge on the average day in July. Adding to the 62 second feet of natural flow, the 54.2 second feet of return flow, and deducting the 104 second feet diverted by prior appropriators, he found that 12.2 second feet of natural flow was

the average remainder at the Franz gauge. This 12.2 second feet of natural flow, added to the 44.8 second feet of project water, totaled the average daily flow of 57 second feet at the Franz gauge. The 12.2 second feet, or 588 miners' inches of natural flow, would seem to leave little for the Allendale canal twelve miles below.

Since it takes the water about four days to go from the divide to the Franz gauge, the water at the gauge during July was that coming over the divide from June 27th to July 27th, inclusive, during which the average project flow was about 56.4 instead of 62.4 second feet. With that change, the average daily flow of 57 second feet at the Franz gauge during July should be attributed, 40.4 feet, or 1,616 miners' inches, to storage flow, and 16.6 second feet, or 664 inches, to natural flow, which still left little for the plaintiff. However, adding to that average the amounts discharged by Boulder, Gird and Byrne Creeks on the preceding days and the excess water existing at the Allendale headgate in spite of intervening diversions, there was no day during the first eight days of July on which the natural flow did not exceed the amount which the water commissioner necessarily permitted to pass the Allendale headgate for prior appropriators below on the creek. On that basis the excess miners' inches of natural flow thus available for the plaintiff's canal on the first eight days of July were 1,223, 523, 523, 464, 483, 403, 596 and 626, respectively, to which the plaintiff was clearly entitled. The figures are not available for subsequent days.

Moreover, if in our computation we use, not the average daily flow of project water, but the actual daily flow which will reach the Franz gauge in four days and the Allendale canal in six days, the result is even more in plaintiff's favor. We shall accept for this purpose defendants' method of computation, their daily averages of water diverted in the upper valley, and also their reflow percentages of 26% for project water and 74% for natural flow. On July 2nd, 818 miners' inches of water were coming over the divide through the main

ten-foot weir, and through the other three weirs an excess of 176 inches over that attributable to prior appropriations, or a total of 994 inches, or about 24.9 second feet. That water on July 2nd would have effect upon the flow at the Franz gauge on July 6th, and at the Allendale intake on about July 8th. On July 6th there were 36 second feet of flow at the Franz gauge.

Presumably the total diversions on July 2nd were not far from the average daily diversions for the month. We may base our computation upon either of two assumptions. The first is that there was present, on the day in question, only the average natural flow of 62 feet, making available, with the 24.9 second feet actual flow of project water, a total of only 86.9 to supply the average diversions of 140.6, and still leave 36 at the Franz gauge on July 6th. That, however, would assume a return flow of 89.7 second feet, or over 103%, which seems incredible. On even that basis, the 36 second feet at the Franz gauge on July 6th would have consisted of not over 11.6 second feet, or 464 miners' inches, of project water and 24.4 second feet, or 976 miners' inches, of natural flow. Thus not over 464 of the 1,322 miners' inches entering Allendale canal on July 8th could possibly have been project water. And the 976 inches of natural flow, plus the 2,220 inches flow of Boulder, Gird and Byrne Creeks, less the 80 inch decrease at the Maxville gauge next day and the additional 78 inch decrease above the Allendale headgate (thus attributing those entire losses to natural flow, although some part of them is properly attributable to project water), totals a natural flow of 3,038 inches at the latter point on July 8th. Deducting the 2,180 inches flowing downstream past the headgate on that day, 858 inches of natural flow remain which, together with the 464 inches of project water, total the 1,322 inches then present in the Allendale canal.

But on the second, and more reasonable assumption that the entire average flow of 124.4 second feet was present on July 2nd, only 24.9 of which could have been project water, the

remainder or 99.5 constituted natural flow. On that basis the excess 16.2 second feet, plus the 36 second feet remaining at the Franz gauge constituted a gain of 52.2 second feet, of which the project's assumed 26% would be 13.6. The latter figure added to the 24.9 brought over the divide totals 38.5 second feet, which is only 1.9 more than the 36.6 sold in the upper valley. Thus not more than 1.9 second feet, or 76 miners' inches, of storage water could have been present at the Franz gauge on July 6th, or at the Allendale intake on July 8th. On the other hand, 34.1 second feet, or 1,364 miners' inches, constituted natural flow at that point on July 6th, and at the Allendale canal on July 8th. Using that figure in the computation of the last two sentences of the preceding paragraph, and again assuming that the losses of 80 and 78 inches were entirely of natural flow water, we find that the 1,322 miners' inches of water in the Allendale canal on July 8th were apparently composed of 1,246 inches of natural flow and only 76 inches of project water.

We are aware of the fact that on the day in question the average of 36.6 second feet of project water may not have been diverted in the upper valley. However in that case the project's proportion of return flow would be proportionately decreased. Furthermore, the entire amount brought over on July 2nd, increased by the full estimated reflow, without deduction for diversion, evaporation, etc., would be 1,515 miners' inches, which is little more than the 1,322 miners' inches entering the Allendale canal on July 8th. And without diversion there can be no reflow.

The deficiencies are approximately the same in regard to the water reaching the Allendale canal during the first seven days of July, since between June 25th and July 1st the project water brought over never exceeded 29.5 second feet, which is only 4.6 second feet more than that brought over on July 2nd and used in the last computation. On the other hand, the natural flows of Boulder, Gird and Byrne Creeks alone on the

first seven days were 11 to 21 second feet greater than on the 8th.

Since the findings of fact separately mention the period from July 9th to 17th, inclusive, we shall apply the same computation to the project water coming over the divide between July 3rd and 11th, assuming that the total amount available continued to be the average of 124.4 second feet. On that basis we find project water at the Franz gauge on July 7th, 8th, 9th, and 10th, and available at the Allendale intake on July 9th, 10th, 11th and 12th, amounting to 13.3, 14.3, 25.1 and 33 second feet, respectively, or 532, 572, 1,004 and 1,320 miners' inches. On those latter four dates, the Allendale canal carried 1,322, 1,322, 1,322 and 2,198 miners' inches, and it is apparent that some water in the canal was therefore natural flow available for plaintiff on those days.

The natural flow in the upper valley, with which the water coming over the divide was intermingled on July 7th, 8th, 9th, 10th and 11th (effective at the Franz gauge July 11th, 12th, 13th, 14th and 15th, and at the Allendale intake on July 13th, 14th, 15th, 16th and 17th), together with the reflow thereon at the 52.2 percentage return found by defendants' witness, was sufficient to furnish only about one-half of the 140.6 second feet diverted in the upper valley. Obviously there is some delay in reflow but without reference thereto we shall in our computation for those days attribute one-half of the diversions and therefore of the reflow to project water instead of only 26% attributed to it on the average day by defendants' witness. On that basis we find project water available at the Franz gauge on July 11th, 12th, 13th, 14th and 15th of 72, 76, 84, 88 and 84 second feet, respectively, or 2,880, 3,040, 3,360, 3,520 and 3,360 miners' inches, respectively, exceeding the flow in the Allendale canal on July 13th, 14th, 15th, 16th and 17th respectively. Thus it is possible for the entire flow in the canal on those days to have consisted entirely of project water.

While it appears that the canal could have carried additional amounts of water on those days, the record indicates that there was no natural flow at the Franz gauge after July 10th (and therefore at the Allendale headgate after July 12th), and that there was little, if any, natural flow available for plaintiff from Boulder Creek or other sources. Apparently no possible error in the premises or in the method of calculation can have made sufficient difference to alter the result in that respect. However, it is clear that the defendants interfered with plaintiff's rights from July 1st to 12th, inclusive, and that plaintiff was entitled to the injunction sought on July 8th.

We have suggested above some doubt as to how much weight should be given to the conclusion of the defendants' witness that only 62 second feet of the average July flow of upper Flint Creek constituted natural flow, and that all excess above that figure, added to the average flow of project water, constituted reflow after diversion. However the mode of determination of that natural flow was not inquired into, so that we cannot say that the figure was not approximately correct or that the computations based thereon were erroneous. But our conclusion is that even if we accept those methods and results, the plaintiff was entitled to the injunction as prayed for on July 8.

There was some discussion relative to the failure of both plaintiff and defendants to install measuring devices at the points of delivery of purchased or appropriated water. However that question has no bearing upon the controversy now before us.

One of the assignments of error relates to the trial court's action in entering its decree without acting upon plaintiff's exceptions to the findings of fact and conclusions of law. While there was no duty on the court to wait for plaintiff's exceptions before entering the decree (*Gans & Klein Inv. Co.* v. *Sanford*, 35 Mont. 295, 88 Pac. 955), the exceptions did precede it; and certainly it was the duty of the court to dispose of

them, since by so doing the errors might have been remedied and the appeal obviated.

Plaintiff also contends that since the appropriators on Flint Creek had a vested right to take all of the waters flowing in the stream according to their several priorities, the provision of section 349.19, Revised Codes, is invalid which provides that: "The board may reclaim and possess all waters furnished or supplied by it seeping or overflowing from the previous place of use."

The water of defendants' project was not present in Flint Creek and constituted no part of plaintiff's vested interests when the Act was passed, and it is not apparent why the legislature could not have constitutionally encouraged the introduction of alien water into a watershed by a provision of that kind. (See *Ide* v. *United States*, 263 U. S. 497, 44 S. Ct. 182, 69 L. Ed. 407; *United States* v. *Haga*, D. C., 276 Fed. 41.) We conclude, therefore, that the defendants were within their rights in taking credit for reflow of project water.

Most of the argument on this point is devoted to the difficulty of identifying the return flow so as to establish the extent of defendants' right. That, however, is a matter of proof, and while it may not be susceptible of exact mathematical demonstration, we are not prepared to say that it is so difficult of approximate proof as to be virtually impossible. Certainly the premises and method of computation used in this suit have not been shown erroneous, and we have therefore accepted them as sufficient here.

Plaintiff complains also that no account is taken by defendants as to losses of project water by evaporation, consumption through use, seepage out of the watershed, and other possible causes. However, it is apparent that the manner of computation used in the determination of reflow necessarily determined only the reflow remaining after the deduction of all possible losses down to the Franz gauge. The readings of other gauges below indicate that further losses can not have

been heavy enough to overcome the situation shown above for the days after July 12th.

The cause is remanded to the district court with direction to render findings of fact and conclusions of law and decree in accordance herewith.

ASSOCIATE JUSTICES ANGSTMAN, ERICKSON, ANDERSON and MORRIS concur.