JUSTICE McKINNON,
dissenting.
¶76 I respectfully dissent from the Court’s opinion. I would reverse the Water Court’s opinion regarding Pondera’s annual irrigation and place of use. I would affirm the Water Master’s finding limiting Pondera’s annual irrigation to 56,556 acres. I would affirm the Water Master’s finding limiting Pondera’s place of use to the approximately 85,000 acres described on the share certificates. I would reinstate the Water Master’s order requiring Pondera to comply with Curry’s discovery request to produce the share certificates.
I
¶77 The standard adage teaches us that “hard cases make bad law.” Northern Securities Co. v. United States, 193 U.S. 197, 364 (1904) (Holmes, J., dissenting). Today the Court reinforces the adage. Several issues make this case quite difficult to discuss and decide with any amount of clarity. First, the parties litigated this case — regarding Pondera’s annual irrigation and place of use — as if Pondera has a single appropriation. As a consequence, the Water Master and the *119 Water Court both analyze Pondera’s water rights in the collective regarding these two issues. We are now forced to do the same. The problem with this methodology is that the rules of water law were intended to deal with individual appropriations and do not lend themselves to limiting appropriations as a whole, particularly with a public service corporation where the original intent of each of the individual appropriators is of the utmost importance.
¶78 Second, the Water Court uses the term “service area” as if it is a term of art and fails to provide an actual definition for the term. Service area is not a recognizable term in Montana law or western water law and does not have a specific definition. Because the Water Court fails to define the term, it is inherently challenging to determine whether Pondera is entitled to a “service area” and even more challenging to define the limits.[1]
¶79 Third, both Curry and Pondera misread this Court’s seminal decision in Bailey. On one hand, Curry maintains that under Bailey — even for a public service corporation — actual beneficial use is a necessary prerequisite to a completed appropriation and an appropriator cannot obtain an appropriation of water in an amount greater than actual beneficial use. However, in Bailey, the public service corporation was permitted a water right in the amount of 2,200 miner’s inches despite only actually beneficially using 1,430 miner’s inches. Pondera, on the other hand, contends that Bailey recognizes that offering water for sale is a beneficial use for a public service corporation. Bailey cannot be read to stand for such a proposition. Such a view, if adopted, would fundamentally alter Montana water law, leading to unchecked speculation without any requirement that water be actually used. As explained more fully below, Bailey does not recognize that offering water for sale is a beneficial use. Instead, Bailey adopts principles consistent with the so-called “growing communities” doctrine wherein a water right may be perfected based on future beneficial use, rather than actual beneficial use. Thus, neither party has advanced an interpretation oí Bailey which assists in resolving the particular issues here and which maintains the integrity of certain *120 basic principles of western water law and water law long recognized in this State.
¶80 Fourth, in addition to delineating a place of use, the Water Court and the Water Master both place an annual acreage limitation on Pondera’s water rights. The elements of an appropriative water right are: (1) quantity of water, typically expressed in flow rate (cubic feet per second) and/or volume (acre-feet); (2) place of use (total acreage); (3) period of use (months, days); (4) point of diversion (legal description); (5) purpose of use (e.g., irrigation, domestic, culinary use, commercial use, or otherwise); and (6) priority date of the appropriation (date). An annual acreage limitation does not fit into any of these categories. While annual acres irrigated is a necessary component in determining flow rate, volume, and place of use, the parties do not offer any authority to support incorporation of an annual acreage limit as an express element of an appropriative water right. Nor do the parties explain why the Water Master and the Water Court did so in this case.[2]
¶81 Fifth, the Water Court removed jurisdiction of this case from the Water Master prior to the Master finishing its proceedings. While the Water Master issued a report with findings of fact and conclusions of law, the Water Master stayed its final determination until Pondera produced the share certificates pursuant to Curry’s discovery request. As a result, the Water Master did not complete a tabulation of Pondera’s water rights and its final conclusions are necessarily incomplete. We are thus left to guess regarding the Master’s final disposition of Pondera’s water rights.
¶82 Lastly, the Water Court fails to articulate the standard of review it used to consider and ultimately reverse the Water Master regarding the two most salient issues on appeal: the annual acreage limitation and place of use. Although the Water Court carefully and prudently reviewed other issues in the Water Master’s report, with respect to *121 these two issues, there is noticeably absent any language in the Water Court’s opinion indicating whether the Water Master clearly erred in making a certain finding of fact, misapprehended the effect of certain evidence, or otherwise misapplied applicable law. The most that can be gleaned from the Water Court’s opinion is that the Water Court appears to conclude that the Water Master erred by failing to grant Pondera a “service area,” while nonetheless concluding that the “Master’s decision amounted to creation of a service area.” Thus, rather than having the benefit of another court’s review prior to our own, we are essentially left with two standalone opinions.
II
¶83 Given the aforementioned difficulties, I will nevertheless endeavor to set forth why the principles the Court announces here today cannot withstand scrutiny and will ultimately be proven unsound in future cases. I offer my analysis with the hope that when these principles are revisited — which I believe to be certain — parties may brief their arguments accordingly.
¶84 Our decision in Bailey enunciates most of the applicable law in determining the extent of Pondera’s water rights. Read without context, Bailey is a difficult case to decipher. However, read in the broader context of background principles of western water law, Bailey is a straightforward decision. In Bailey, this Court broke from traditional principles of water law — requiring actual beneficial use to perfect a water right — and adopted principles consistent with the so-called “growing communities” doctrine. The growing communities doctrine is an infrequently invoked exception to the common law requirement of actual beneficial use for perfection of a water right, which permits appropriators — typically only municipalities — to perfect a water right based on anticipated future or contemplated beneficial use.
¶85 Before addressing the issues on appeal, I will address the governing law by: first, laying out traditional principles of the prior appropriation doctrine; second, discussing the limited exception to those principles, i.e., the growing communities doctrine; and finally, discussing Bailey.

Traditional Water Law:

The Requirement of Actual Beneficial Use and a Completed Appropriation

¶86 Fundamental to water law in the west is the principle that “beneficial use shall be the basis, the measure and the limit of all rights to the use of water.” McDonald v. State, 220 Mont. 519, 530, 722 P.2d *122 598, 605 (1986) (emphasis in original). “State constitutions, statutes, and judicial decisions throughout the western states recognize the concept.” A. Dan Tarlock, et al., eds., Water Resource Management: A Casebook in Law & Public Policy 195 (4th ed. 1993).
¶87 Equally important to the prior appropriation doctrine is the principle that “application of water to beneficial use is essential to a completed appropriation.” State ex rel. State Eng’r v. Crider, 78 N.M. 312, 315, 431 P.2d 45, 48 (1967). “Judicial opinions and scholarly commentators have repeatedly stated the rule that application to a beneficial use is the touchstone of the appropriation doctrine.” In re Adjudication of Existing Rights to the Use of all Water, 2002 MT 216, ¶ 10, 311 Mont. 327, 55 P.3d 396. In Montana, like all other western states, to complete a valid appropriation an appropriator must: (1) demonstrate a bona fide intention to apply the water to some existing or contemplated beneficial purpose, and (2) actually beneficially apply the water to the intended lands. Toohey v. Campbell, 24 Mont. 13, 14, 60 P. 396, 396 (1900); In re Adjudication of Existing Rights to the Use of all Water, ¶ 10 (“the true test of appropriation of water is the successful application thereof to the beneficial use designed”). Both elements need not occur simultaneously. Rather, an appropriator is permitted a reasonable amount of time to actually apply the water to the intended lands. McDonald, 220 Mont. at 529, 722 P.2d at 604. However, until the appropriator perfects his water right by actual use, the appropriator holds only an “inchoate right” to the water.[3] Mont. Dep’t of Natural Res. & Conservation v. Intake Water Co., 171 Mont. 416, 436, 558 P.2d 1110, 1121 (1976). Thus, the ultimate “application of the water to the intended beneficial use is the final step taken by the appropriator in acquiring an appropriative right” and the “[application of the water to such use is absolutely essential to acquisition of the right.” 1 Wells A. Hutchins, Water Rights Laws in the Nineteen Western States 442 (1971) (hereinafter, Hutchins) (emphasis added).
¶88 As a necessary corollary, the extent of the appropriation is measured by: (1) the appropriator’s bona fide intent at the time of the appropriation, and (2) the appropriator’s actual beneficial use at the time of perfection. Jacobs v. Harlowton, 66 Mont. 312, 320, 213 P. 244, 246 (1923). In turn, actual beneficial use is limited by: (1) the needs of the appropriator and (2) the capacity of the diversion. Skelton Ranch, Inc. v. Pondera Cty. Canal & Reservoir Ca, 2014 MT 167, ¶ 55, 375 *123 Mont. 327, 328 P.3d 644. “If an appropriator’s needs exceed the capacity of his means of diversion... then the capacity of the diversion measures the extent of his water right.” Skelton Ranch, ¶ 55. Accordingly, an appropriator’s water right is measured by the lesser of the following: (1) the appropriator’s bona fide intent at the time of the appropriation; (2) the actual needs of the appropriator at the time of perfection; and (3) the capacity of the diversion at the time of perfection.[4]

Growing Communities Doctrine:

The Exception from Actual Beneficial Use and the Reservation of Water for Future Needs

¶89 “Municipalities occupy a unique place in the water appropriation philosophy of the West.” Hutchins, 245. As western municipalities grew both in number and in population, “it became the accepted practice to give them special treatment in appropriating water for the service of their inhabitants.” Hutchins, 246. The growing communities doctrine affords municipalities such special treatment by breaking from the fundamental rule of the prior appropriation doctrine requiring prior actual beneficial use. As such, the doctrine is generally “characterized as a subset of the prior appropriation doctrine.” Janis E. Carpenter, Symposium on Northwest Water Law: Water for Growing Communities: Refining Tradition in the Pacific Northwest, 27 Envtl. L. 127, 134-35 (1997) (hereinafter, Carpenter, Symposium on Northwest Water Law).
¶90 Under the growing communities doctrine, the traditional requirement of actual beneficial use is relaxed, permitting “cities to perfect a water right to the amount of water that they will need to meet reasonably anticipated future growth.” A. Dan Tarlock, Law of *124 Water Rights and Resources § 5:71 (2015) (hereinafter, Tarlock). The theory of the “doctrine reflects a concept of constructive beneficial use because it includes an amount of probable future municipal use, as well as actual use.” Dep’t of Ecology v. Theodoratus, 135 Wash. 2d 582, 615, 957 P.2d 1241, 1257 (1998) (Sanders, J., dissenting) (quoting Carpenter, Symposium on Northwest Water Law, 27 Envtl. L. at 136) (internal quotation marks omitted) (emphasis added).
¶91 The growing communities doctrine is generally recognized throughout the western states. See State ex rel. Reynolds v. Rio Rancho Estates, Inc., 95 N.M. 560, 564, 624 P.2d 502, 506 (1981) (“When determining the extent of a municipal water right, it is appropriate for the court to look to a city’s planned future use of water from the well caused by an increasing population.”); City & Cnty. of Denver v. Northern Colo. Water Conservancy Dist., 130 Colo. 375, 384, 276 P.2d 992, 997 (1954) (“when appropriations are sought by a growing city, regard should be given to its reasonably anticipated requirements.”); Hutchins, 246-49 (discussing the growing communities doctrine and the various ways different states allow municipalities to “appropriate water for contemplated future reasonable needs”) (emphasis added). The Montana Legislature has codified the growing communities doctrine in § 85-2-316, MCA, which provides, in part: “The state, any political subdivision or agency of the state ... may apply to the department to acquire a state water reservation for existing or future beneficial uses ....” (Emphasis added.)[5]
¶92 However, the “doctrine is not without limits.” Tarlock, § 5:71. An appropriation under the doctrine is limited in the same way as a traditional appropriation, with the exception of a relaxed allowance for anticipated needs. Under the doctrine, an appropriation is measured by the lesser of: (1) the appropriator’s bona fide intent at the time of the appropriation; (2) the reasonably anticipated needs (rather than the actual needs); and (3) the capacity of the diversion. Pagosa Area Water & Sanitation Dist. v. Trout Unlimited (In re Application for Water Rights), 170 P.3d 307, 314-17 (Colo. 2007);[6] Theodoratus, 135 *125 Wash. 2d at 609-10, 957 P.2d at 1254 (Sanders, J., dissenting).
¶93 Additionally, unlike traditional appropriations, courts impose a condition subsequent on the right, requiring that the “water must be actually applied to beneficial use within a reasonable period of time.” Tarlock, 5:71. If the appropriator fails to apply the water right to actual beneficial use within a reasonable period, the water right is lost. Tarlock, 5:71. See also Crider, 78 N.M. at 316, 431 P.2d at 49 (‘We add, however, that the cities’ rights to the appropriation of water for future use is subject to the condition that the needed water be applied to beneficial use within a reasonable time. If not so applied such right may be lost.”).
¶94 The growing communities doctrine thus seeks to establish a balance between preserving use of water for actual use and the need for development in the arid west. Nonetheless, the “doctrine clearly conflicts with the basic common law tenet of prior beneficial use and can only be viewed as an exception.” Darryl V. Wareham, Washington Water Rights Based on Actual Use or on Delivery System Capacity ? Department of Ecology v. Theodoratus, 24 Seattle Univ. L. R. 187, 205 (2000). Consequently, the growing communities doctrine typically applies only to municipalities. Hutchins, 382 (explaining that, to the best of the author’s knowledge, applying the doctrine outside of municipalities has “[njever... been sanctioned by any high court in the West.”); but see Theodoratus, 135 Wash. 2d at 617, 957 P.2d at 1258 (Sanders, J., dissenting) (contending that the “doctrine is equally applicable to private developments.”). Because the doctrine breaks from bedrock principles of actual beneficial use, an appropriator’s attempt to perfect a water right in an amount for future beneficial use is often met with both skepticism and resistance from courts. See, e.g., PagosaArea Water & Sanitation Dist., 170 P.3d at 317 (explaining that the “water court should closely scrutinize a governmental agency’s claim” for future beneficial use).

Bailey

¶95 In Bailey, this Court adopted the principles of the growing communities doctrine for a public service corporation. Aside from extending the doctrine outside the applicability of only municipalities, *126 Bailey is typical in its understanding of the doctrine.
¶96 In Bailey, a public service corporation sought to perfect a water right larger than the amount the corporation had put to beneficial use, attempting to perfect a water right in the amount of 2,200 miner’s inches when the company had only ever sold 1,430 miner’s inches for beneficial use. Bailey, 45 Mont. at 162, 122 P. at 577. In accordance with traditional prior appropriation principles, the objectors maintained that the company’s appropriation should be limited by actual beneficial use to 1,430 miner’s inches. Bailey, 45 Mont. at 160, 122 P. at 576.
¶97 This Court disagreed. We addressed the following issues: (1) whether an appropriator could perfect a water right for future or contemplated beneficial use; (2) when such a right is perfected for a public service corporation; and (3) the measure and extent of a perfected right that is based on future or contemplated beneficial use. Bailey, 45 Mont. at 166, 122 P. at 579.
¶98 Before reaching our conclusion on the issues, we discussed the parties’ varying views on whether actual beneficial use is necessary to perfect a water right for a public service corporation. We explained that under the corporation’s “theory thus advanced, the claimant who proceeds under the statute, and performs the acts required as set forth [in the statute], has a completed appropriation of water upon the completion of the work on his ditch, canal, or other means of diversion, even before the water is actually applied to a beneficial use” Bailey, 45 Mont. at 174, 122 P. at 582 (emphasis added). We contrasted this view with the traditional principles advanced by the objectors wherein “it is held that actual application of the water to a beneficial use is a necessary prerequisite of a completed appropriation.” Bailey, 45 Mont. at 174, 122 P. at 582 (emphasis added). We rejected the latter view “as to a public service corporation” because the “public policy of this state [is] to encourage these public service corporations” to develop the arid regions and corporations would be unwilling to do so without the certainty of a completed appropriation. Bailey, 45 Mont. at 177, 122 P. at 583.
¶99 We made the following holdings. First, we agreed with the corporation that it could perfect a water right based on future beneficial use, explaining that, while the statute requires “beneficial use,” the beneficial use “may be prospective or contemplated.” Bailey, 45 Mont. at 175, 122 P. at 582. Second, we held that “as to a public service corporation, its appropriation is complete when it has fully complied with the statute and has its distributing system completed *127 and is ready and willing to deliver water to users upon demand, and offers to do so.” Bailey, 45 Mont. at 177-78, 122 P. at 583. Lastly, we concluded that the extent of the appropriation is limited by: (1) the corporation’s “bona fide intention at the time” the appropriation is made; (2) the corporation’s reasonably anticipated “needs”; and (3) the “capacity” of the corporation’s diversion. Bailey, 45 Mont. at 178-79, 122 P. at 583-84. We further imposed a condition subsequent on the right, concluding that the right may be lost by “nonuser for an unreasonable length of time.” Bailey, 45 Mont. at 179, 122 P. at 584.
¶100 Therefore, Bailey expressly acknowledged that actual beneficial use is not required for a public service corporation to complete an appropriation of water and made clear that a public service corporation may perfect a water right based upon anticipated future beneficial use. Bailey also made clear that a right perfected based upon anticipated future beneficial use is not without limits, expressly imposing a requirement that the water, within a reasonable length of time, be put to actual beneficial use. In doing so, Bailey embraced principles inherent in the growing communities doctrine and balanced the preservation of water for actual use with the need for development in the arid west.
Ill
¶101 Having developed the applicable law and explained Bailey in the context of the broader principles of water law, I will address the issues presented by the instant appeal.

(1) Whether the Water Court correctly concluded that the Water Master clearly erred in finding that Pondera’s water rights are limited to an annual irrigation of 56,556 acres.

¶102 Curry argues that the Water Court erred in reversing the Water Master’s finding that limits Pondera’s annual irrigation to 56,556 acres. He maintains that Pondera’s water rights should be “limited by the extent of historic[al] beneficial use” and the “maximum extent of Pondera’s beneficial use of water is for the irrigation of 56,556 acres.”
¶103 Pondera appears to agree with Curry that its annual irrigation is limited by historical beneficial use, but disagrees with Curry over the meaning of beneficial use. Pondera maintains that it has historically put 72,000 acres per year to beneficial use by issuing its shares of stock. Relying on Bailey and the Montana Constitution, Pondera reasons that its ready availability of the water for sale to the irrigators is a beneficial use.
¶104 We initially review the Water Court’s order de novo. Skelton *128 Ranch, ¶ 26. Our de novo review begins by determining whether the Water Master’s findings are clearly erroneous. Skelton Ranch, ¶ 38. “The Water Court does not have unfettered discretion in reviewing a master’s findings.” Skelton Ranch, ¶ 69 (Baker, J., concurring in part and dissenting in part). “Differences of opinion or interpretation regarding evidentiary issues cannot constitute clear error.” Skelton Ranch, ¶ 69 (Baker, J., concurring in part and dissenting in part). Rather, “[s]tated more colorfully, a clearly erroneous finding of fact must strike the reviewing court as wrong ‘with the force of a five-week-old, unrefrigerated dead fish.’” Skelton Ranch, ¶ 69 (Baker, J., concurring in part and dissenting in part) (quoting Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988)).
¶105 I agree with Curry that the Water Master did not clearly err by limiting Pondera’s water rights based on Pondera’s historical beneficial use. In the case of a public service corporation,[7] a valid appropriation is limited by: (1) the appropriator’s bona fide intention at the time the appropriate is made; (2) the appropriator’s reasonably anticipated needs; and (3) the capacity of the appropriator’s infrastructure.[8] Bailey, 45 Mont. at 178-79, 122 P. at 583-84.

(a) Bona fide intent

¶106 This Court has “long recognized the importance of an appropriator’s intent at the time of appropriation.” Teton Co-Op Canal Co. v. Teton Coop Reservoir Co., 2015 MT 344, ¶ 33, 382 Mont. 1, 365 P.3d 442. An appropriator’s “intent at the time of appropriation must be determined by his act[s] and by surrounding circumstances, its actual and contemplated use, and the purpose thereof.” Wheat v. Cameron, 64 Mont. 494, 501, 210 P. 761, 763 (1922). An appropriator’s bona fide intent must be objectively reasonable and “not mere expressions of hope or desire reflecting a ‘gleam-in-the-eye philosophy’ regarding future use of the water.” In re Adjudication of the Existing Rights Within the Clark Fork River Drainage Area, 274 Mont. 340, 908 P.2d 1353, 1355 (1995). While an appropriator’s bona fide intent may be based upon future use, his intent cannot be based on “mere future speculative profit or advantage.” Toohey, 24 Mont. at 17, 60 P. at 397. Rather, the appropriator’s intent must be “bona fide” and cannot be a *129 “mere afterthought.” Bailey, 45 Mont. at 178, 122 P. at 583. “The intention of the claimant is therefore a most important factor in determining the validity of an appropriation of water.” Miles v. Butte Elec. & Power Co., 32 Mont. 56, 67, 79 P. 549, 553 (1905). Accordingly, it “becomes the duty of the courts to try the question of the claimant’s intent,” and thereby separate bona fide intent from mere future speculation. Miles, 32 Mont. at 67, 79 P. at 554.
¶107 Here, the passage of time afforded the Water Master with over a hundred years of hindsight to help decipher bona fide intent from mere future speculation. The Water Master made express findings regarding Pondera’s annual irrigation.[9] The Master found that in the 100 year time span between 1884 and 1994 the most Pondera beneficially irrigated in any year was 56,556 acres, which the Master found occurred in 1921. The Master further noted that — prior to the installation of sprinkler systems in the 1990s and the subsequent acquisition of lands in the 2000s — Pondera’s system peaked in 1921. Summarizing the Water Master’s findings of beneficial use by decade, the Master found that Pondera’s maximum annual irrigation was 49,278 acres in the 1910s; 56,556 acres in the 1920s; 46,517 acres in the 1930s; 42,804 acres in the 1940s; 25,941 acres in the 1950s; 37,378 acres in the 1960s; 44,505 acres in the 1970s; and 51,006 acres in the 1980s.
¶108 Pondera’s historical beneficial use provided the Water Master with overwhelming evidence of intent. While there may be some room for disagreement in trying the original appropriators’ bona fide intent, sufficient evidence supports the Master’s finding that limits Pondera’s water rights to an annual irrigation of 56,556 acres. Pondera’s beneficial use in the hundred years following the undertaking of original appropriations — wherein the most Pondera irrigated in a single year was 56,556 acres — provided substantial evidence of an intent to irrigate no more than 56,556 acres per year. Additionally, there is no evidence in the record demonstrating that the original appropriators — at the time they undertook their respective appropriations — desired to irrigate 72,000 acres per year. Furthermore, even if evidence did exist in the record showing an initial desire to irrigate that amount annually, the last 130 years make clear that such a desire was an expression of conjecture, reflecting a “gleam- *130 in-the-eye philosophy” regarding the future use of the water. Substantial evidence supports the Water Master’s finding. The Water Master did not clearly err by limiting Pondera’s water rights based on historical evidence of beneficial use.
¶ 109 Our decision in Bailey does not require a different result. First, and foremost, unlike in Bailey, where this Court determined the corporation’s bona fide intent based on 20 years of evidence, in the present case, we are 130 years removed from the undertaking of the original appropriations. As a result, we have considerable more evidence of bona fide intent than we had in Bailey. The importance of the 130 years of retrospection to the task of determining bona fide intent cannot be overstated. Second, the facts differ greatly from those in Bailey. In Bailey, the original appropriators expressed a desire to appropriate 5,000 miner’s inches when they undertook the appropriation; the corporation built a ditch with a capacity of 2,200 miner’s inches within 4 years; and the corporation put 1,430 miner’s inches to actual beneficial use within 15 years. Bailey, 45 Mont. at 161-65, 122 P. at 577-78. Here, the original appropriators did not express a desire to irrigate 72,000 acres per year when they undertook the appropriations; Pondera did not have the ability to irrigate 72,000 acres per year until 60 years after the undertaking of the appropriations; and Pondera has failed to put water to beneficial use on 72,000 acres in any year within the last 130 years. Bailey is readily distinguishable from the present case. The Water Court erred by concluding that the Water Master clearly erred in limiting Pondera’s irrigation rights to 56,556 acres per year when substantial evidence exists in the record showing that Pondera’s predecessors did not have a bona fide intent to irrigate more than that amount per year.

(b) Reasonably Anticipated Needs

¶110 The requirement that an appropriator demonstrate that his reasonably anticipated needs require the use of water and the requirement of bona fide intent are closely related. The reasonably anticipated needs of an appropriator limit the water right “irrespective of the excessive size or number of ditches by him constructed or the amount of water claimed.” O’Shea v. Doty, 68 Mont. 316, 320, 218 P. 658, 659 (1923).
¶111 Here, the evidence of Pondera’s historical beneficial use — showing over a hundred years of irrigating less than 56,556 acres per year — is also relevant to Pondera’s reasonably anticipated needs. Additionally, Pondera’s outstanding shares — the number of shares held by the landowners — may have also been relevant to this inquiry. However, both the outstanding shares and treasury shares were *131 unavailable to the Water Master.[10] Despite discovery requests from Curry and a subsequent order by the Water Master, Pondera steadfastly refused to provide its stock certificates. Curry seemingly did manage to procure copies of Pondera’s stock certificates for the year 1948, however, and introduce the certificates into evidence. Based on this information, the Master found that, in 1948, Pondera issued approximately 72,000 shares of stock. The Master also found that — of the approximately 72,000 shares issued — only 54,213 shares were outstanding. As the stock certificates were unavailable, the record does not reveal when, if ever, Pondera sold the full 72,000 issued shares to landowners. Testimony from Fay Stokes, the former general manager of Pondera, indicated that prior to the installation of sprinkler systems, Pondera was unable to sell the shares because of a lack of demand by landowners. The available evidence of Pondera’s needs further demonstrates that the Water Master did not clearly err by limiting Pondera’s water rights based on historical beneficial use.
¶112 Pondera persists that the Water Master and Curry are incorrect in their understanding of Pondera’s historical beneficial use. Pondera maintains that it has historically put 72,000 acres per year of water to beneficial use since 1953, reasoning that issuing stock up to its allowed acreage maximum as authorized by the MCLB is a beneficial use. Pondera maintains that both Bailey and the Montana Constitution expressly recognize this principle.
¶113 Pondera’s reliance on Bailey and the Montana Constitution is misplaced. While Bailey arguably recognized that the “sale of water” for a beneficial use is itself a beneficial use, Bailey certainly did not recognize that “offering to sell water” is a beneficial use. Contrary to Pondera’s understanding, this Court in Bailey did not permit the public service corporation, at issue there, a water right in the amount of 2,200 miner’s inches — in lieu of 1,430 miner’s inches — based upon the principle that offering to sell water is an actual beneficial use. *132 Rather, the Court permitted the corporation the additional 770 miner’s inches because it recognized that a completed appropriation for a public service corporation could rest on future beneficial use; that is to say, the future sale of water to irrigators to be put to beneficial use. Whether the 770 miner’s inches in Bailey is characterized as future beneficial use, contemplated beneficial use, prospective beneficial use, or constructive beneficial use, it does not represent actual beneficial use. That Pondera has continually offered water for sale on 72,000 acres per year is not representative of its existing beneficial use. Pondera’s actual beneficial use is represented by the water that it sells for a beneficial use, not the water that it offers to sell.
¶114 To conclude otherwise would be tantamount to sanctioning speculation, permitting water rights to be created without any actual use and then held indefinitely without any actual use until the appropriator sees fit. Whale speculation is commonplace with other commodities, it has long been settled in this State that water is far too scarce of a resource to speculate with. Thorp v. Freed, 1 Mont. 651 (1872). The adoption of Pondera’s interpretation of Bailey would without a doubt fundamentally alter Montana water law.
¶115 I believe the Court makes the gravest of mistakes in doing so today. As the Colorado Supreme Court explained in rejecting a similar argument, “The right to appropriate is for use, not merely for profit.” Colo. River Water Conservation Dist. v. Vidler Tunnel Water Co., 197 Colo. 413, 417, 594 P.2d 566, 568 (1979) (emphasis in original). Allowing an appropriator to obtain an appropriation and hold the appropriation based merely on his ability to provide water for sale will “encourage those with vast monetary resources to monopolize, for personal profit rather than for beneficial use, whatever unappropriated water remains.” Colo. River Water Conservation Dist., 197 Colo. at 417, 594 P.2d at 568. We should emphatically reject the argument advanced by Pondera and refuse to countenance the “claim that mere speculators, not intending themselves to appropriate and carry water to a beneficial use or representing others so intending, can by survey, plat, and token construction compel subsequent bona fide appropriators to pay them tribute by purchasing their claims in order to acquire a right guaranteed them by our Constitution.” Colo. River Water Conservation Dist., 197 Colo. at 417, 594 P.2d at 568-69.
¶116 In sum, Pondera’s offering 72,000 shares of stock for sale does not represent beneficial use. Pondera’s offering water for sale represents nothing more than an attempt to speculate with a resource owned by the People of the State of Montana. Our Constitution *133 guarantees a right to appropriate for beneficial use; it does not guarantee a right to speculate. I would thus reject Pondera’s argument that issuing shares of stock — or, for that matter, any other method of offering water for sale — is an actual beneficial use of water.
¶117 Lastly, in the face of a hundred years of irrigating less than 56,556 acres per year and in the absence of any evidence showing in the last century it has ever irrigated 72,000 acres in a year, Pondera argues that its compliance with the Carey Land Act demonstrates intent to irrigate 72,000 acres per year.
¶118 Assuming, for the purposes of argument, that the demonstration of a desire to follow a legislative act is adequate to overcome the bona fide intent that can be gleaned from actual beneficial use over the past century, the Water Master correctly rejected Pondera’s reliance on the Carey Land Act. The Water Master concluded that Pondera’s suggestion that its early predecessors intended to take advantage of that legislation is speculative and unfounded. The Master noted generally that Pondera’s early water rights largely fall into two main categories: (1) water rights established by individual appropriators in the late 19th century, with priority dates ranging from April 9,1884, through September 18,1901, and (2) water rights established by the Conrad brothers in the early 20th century, with priority dates ranging from June 21,1900, through April 12, 1906.
¶119 The Water Master found that neither of these two categories of water rights were initiated with the Carey Land Act in mind. First, the Master explained that Congress enacted the Carey Land Act into law on August 18,1894, and that “[n]o claim with a priority date before then can be credibly urged as intended to take advantage of the [A]ct.” Second, the Master noted that, even after the passage of the Carey Land Act, the Act further required Montana to enact enabling legislation before landowners could utilize the Act, which occurred in 1903.[11] Third, the Water Master found that the earliest any appropriator formed a construction company in the Valier area, which is necessary to comply with the Act, was in 1908. Lastly, the Water Master found that the intention of the Conrad brothers “was to serve their own empire” and that the “Carey Land Act idea came later.” The Water Master explained the Conrad brothers “were looking to irrigate 9,600 acres, not 72,000.” Thus, the Water Master expressly rejected Pondera’s suggestion “that the early rights of its predecessors were *134 acquired for gradual development of what became the Carey Land Act project.”
¶120 Our decision in Toohey is consistent with the Water Master’s decision. In that case, an appropriator, Flannery, evinced intent to appropriate water in 1868 by the construction of ditches and the installation of fencing surrounding his property. Toohey, 24 Mont. at 17, 60 P. at 397. In 1873, Congress passed the Timber Culture Act, permitting homesteaders to acquire up to an additional 160 acres of land provided they met certain requirements. In 1876, Flannery claimed an additional 160 acres under the Act. Thirteen years later, in 1889, Flannery applied water to beneficial use on both the lands owned prior to the passage of the Act as well as the lands subsequently acquired under the Act. Toohey, 24 Mont. at 18, 60 P. at 397.
¶121 On appeal to this Court, Flannery maintained that he could acquire enough water for use on all his lands. We rejected his argument, explaining that a person cannot acquire any part of a stream for “mere future speculative profit or advantage.” Toohey, 24 Mont. at 17, 60 P. at 397. We reasoned: “As the timber-culture act was not passed until 1873, and was not proceeded under by Flannery until 1876, he could not have had in contemplation [irrigation of the additional lands] under this law before its enactment by congress.” Toohey, 24 Mont. at 18, 60 P. at 397. Thus, we concluded that “his intent, in 1868, in the then present and contemplated use of the water then diverted, never reached beyond the purpose of irrigating the part of the [original] tract.” Toohey, 24 Mont. at 18, 60 P. at 397.
¶122 Here, like Flannery, Pondera cannot rely on a legislative act to establish intent when its claims predate the passage of the legislative act; predate the enabling legislation; and predate an attempt by its predecessors to proceed under the legislation. Congress enacted the Carey Land Act into law on August 18, 1894; Montana enacted enabling legislation to implement the Act in 1903; and none of Pondera’s early predecessors proceeded under the Carey Land Act until the earliest 1908. Four of Pondera’s consolidated claims entirely predate the passage of the Carey Land Act; twenty-one predate the passage of Montana’s enabling legislation; and all of the early claims predate any attempt by Pondera’s predecessors to proceed under the Act. Thus, “[a]s the [Carey Land] act was not passed until 18[94], and was not proceeded under by [Pondera’s predecessors] until [1908], [they] could not have had in contemplation [irrigation of lands] under this law.” Toohey, 24 Mont. at 18, 60 P. at 397.
¶123 Moreover, even if we were to break from this long-standing precedent and overrule Toohey, there is an absence of evidence in the *135 record showing that any original appropriators of its early claims actually did intend to rely on the Carey Land Act. In fact, Pondera appears to agree that its predecessors did not contemplate taking advantage of the Carey Land Act until W.G. Cargill purchased the Conrad brothers’ interest in 1907, which is well after original appropriators undertook appropriations — in several instances, two full decades afterwards.
¶124 If there is one universal rule in western water law, it is that the future beneficial use of the water “must have been within the appropriator’s original intent in undertaking such appropriations.” Hutchins, 496 (emphasis in original). We have reiterated this rule on numerous occasions, stating it is the appropriator’s “intent at the time of appropriation” that controls the extent of the water right. In re Adjudication of Existing Rights to the Use of all Water, ¶ 22 (emphasis in original). Accord Wheat, 64 Mont. at 501, 210 P. at 762; Toohey, 24 Mont. at 18, 60 P. at 397; Teton Co-Op Canal Co., ¶ 33. Further, in case there be any doubt, we expressly adhered to this principle in Bailey, concluding that “at the time of the initiation of appellant’s right in 1892 [the original appropriators] had the bona fide intention at the time to apply the water, which they sought to appropriate, to a useful and beneficial purpose.” Bailey, 45 Mont. at 178-79, 122 P. at 583 (emphasis added).
¶125 I see no reason to deviate from over a hundred years of precedent and thereby create a special exception for Pondera. The Water Master correctly rejected Pondera’s reliance on the Carey Land Act to show intent to irrigate 72,000 acres per year. The record supports the Water Master’s determination that Pondera’s early predecessors did not contemplate irrigation under the Carey Land Act.
¶126 Based upon the foregoing, I would conclude that the Water Master did not clearly err by limiting Pondera’s water rights based on historical beneficial use. Pondera presented the Water Master with a number of different claims; with a number of different priority dates; and with a number of different original appropriators. Using historical beneficial use was not only an acceptable way to determine the extent of Pondera’s collective water rights, it was likely the only way.[12] In light of the overwhelming evidence of historical beneficial use and in *136 the absence of other clear evidence of original intent, the Water Master correctly limited Pondera’s water rights based on historical beneficial use. Substantial evidence supports the Water Master’s finding limiting Pondera’s irrigation rights to 56,556 acres per year. Accordingly, the Water Court erred in reversing the Water Master’s finding.[13]

(2) Whether the Water Court correctly concluded that the Water Master clearly erred in finding Pondera’s place of use should be the approximately 85,000 acres listed on the share certificates.

¶127 Curry contends that the Water Court erred in reversing the Water Master’s finding that Pondera’s place of use should be the acres listed on Pondera’s share certificates and maintains that the Water Master’s order that requires Pondera to supplement the record with a list of the share certificates should be reinstated.
¶128 The Water Master found that Pondera’s place of use should be the total acres described on the share certificates. Testimony at trial indicated that the acres described on the share certificates correlated to historical use. The Water Master noted, however, that if the area described on the share certificates deviates substantially from 85,000 acres the acreage listed is in error. The Master explained that the Department of Natural Resources and Conservation (DNRC) verified 85,296 irrigable acres under Pondera’s system using data from the Pondera County Water Resources Survey (WRS) and 85,357 irrigable acres using data from the United States Department of Agriculture (USDA). Thus, the Water Master stayed the proceedings and its final determination until Pondera produced its share certificates.
*137 ¶129 There is no error in the Water Master’s analysis limiting Pondera’s place of use to the area described on the share certificates. Here again, the Water Master’s reliance on historical beneficial use was an acceptable method to determine the extent of Pondera’s rights. The evidence in the record indicates that Pondera has historically irrigated an area no larger than 85,000 acres in the last 130 years. In 1920, Pondera’s chief engineer, C.E. Atwood, compiled alist of irrigable acres under Pondera’s system and concluded that 85,527 acres were irrigable. Similarly, the WRS Report, written by the State Engineer in 1964, concluded that Pondera’s irrigation project has been “operated and maintained adequately with approximately 80,000 acres of land being served.” The WRS Report further concluded that Pondera “had 83,303.20 acres irrigated in 1963 and 2,438 acres potentially irrigable.” Testimony at trial also indicated that Pondera irrigates approximately 80,000 acres. Lastly, Pondera conceded in its motion for summary judgment that it currently irrigates 85,375.8 acres. Thus, based on this overwhelming evidence of intent to irrigate 85,000 acres, the Water Master did not clearly err in delineating a place of use for Pondera that is approximately 85,000 acres.
¶130 The question then becomes the location of the 85,000 acres that Pondera is entitled to claim as its place of use. The Water Use Act required the Water Master to determine Pondera’s place of use as it existed prior to July 1, 1973. Section 85-2-227(1), MCA. Based on the testimony at trial, the share certificates accurately reflect each and every acre Pondera irrigated prior to July 1, 1973, which testimony established totals approximately 85,000 acres. Pondera did not offer any evidence of historical use at trial. Nor did Pondera take issue with the testimony at trial that the acres described on the share certificates accurately reflect the historical use of its water rights. Given the evidence of historical use, the Water Master did not clearly err by finding that Pondera’s place of use as it existed prior to July 1, 1973, was the approximately 85,000 acres described on the share certificates. The Water Court erred by reversing the Water Master’s finding. I would reinstate the Water Master’s order requiring that Pondera produce its share certificates pursuant to Curry’s discovery request.[14],[15]
*138 IV
¶131 I believe that the principles the Court announces today will ultimately prove unsound. The Court today allows an appropriator to claim an appropriation to irrigate 72,000 acres per year and permits the appropriator to irrigate a 377,000 acre area. It does so despite the fact that the appropriator has failed to irrigate 72,000 acres in any year or irrigate a 377,000 acre area since the inception of the appropriator’s rights some 130 years ago. Worse yet, the Court holds that for those appropriators, who are engaged in the business of selling water, beneficial use does not require actual use, but instead is the availability of water for sale. There is no doubt in my mind that the rampant speculation that will ensue from this decision will force this Court’s hand to either expressly overrule the decision or distinguish it from future cases based on inconsequential facts.
¶132 The Court seems to acknowledge as much already and attempts to use the general adjudication as a fail-safe, remarking that its decision is not definitive “at this stage in the adjudication process.” Opinion, ¶ 50. In my view, the Court’s fail-safe is woefully unacceptable. First, I cannot see how the “adjudication process” will *139 change the Court’s rules of law or its express holdings regarding the facts of this case. Pondera’s beneficial use will remain nonuse in the general adjudication. And, if over a century of nonuse does not persuade this Court that Pondera’s water rights are less than Pondera claims, nothing will. Second, even if the Court’s rules were so malleable that the general adjudication would somehow change them, in my view the looming general adjudication is an unacceptable excuse to kick the can down the road. I am sure Curry would have wished to wait for the general adjudication as well, but that was not an option he was presented with. Beginning in the 2000s, Pondera started irrigating more acres per year and in more places than it had done in the previous century. In aid of its growing needs, Pondera locked Curry’s headgate, thereby threatening Curry’s way of life. In short, Pondera sought to compel Curry to pay tribute for a century of Pondera’s existence in the area and to finally earn a reward for decades of speculation, Colo. River Water Conservation Dist., 197 Colo. at 417, 594 P.2d at 568-69, which left Curry with no choice but to seek redress and a court determination of the extent of Pondera’s water rights. There is no excuse for this Court to wait until the general adjudication to determine the annual acreage and place of use for Pondera’s water rights. The parties raised those issues below and now have squarely presented those issues to this Court for review.
¶133 I agree with the Court’s resolution of Issue 5. In respect to Issue 4, it is my view the Water Court substituted its judgment for that of the Water Master regarding the Gray Right, and I would affirm the Water Master on the Gray Right. After a review of the record, substantial evidence supports the Water Master’s finding of a flow rate of 0.95 cfs.

 The term is an engineering term, not a water law term. Because the term merely adds confusion, I would suggest not adding it to this Court’s lexicon. It is not as if we need to create a new term because Pondera does not have a place of use. Both the Water Master and the Water Court agree Pondera has a place of use. The Water Master found Pondera’s place of use to be an approximately 85,000 acre area and the Water Court found it to be an approximately 377,000 acre area.

 The Water Master was concerned with Pondera’s total volume. And, in addition to the express limitation on annual irrigation, the Master used Pondera’s annual irrigation to limit volume, concluding that Pondera’s volume is limited to the “amount needed to provide 1.5 aPacre for 56,556 irrigated acres plus a reasonable amount for transportation and evaporation losses of 30%.” The Water Court’s opinion does not appear to contain a similar volume limitation. It is unclear whether the volume limitation now exists on Pondera’s water rights. I will discuss the annual limitation as if it is a basis to limit volume — though it is unclear if that is why the parties dispute the annual acreage or if the parties merely dispute the annual acreage as an independent element of the water rights.

 An inchoate water right is “an incomplete appropriative right in good standing.” Hutchins, 226.

 In McDonald, this Court expressly recognized that these principles are enshrined in the Montana Constitution, stating:
The foregoing cases and many others serve to illustrate that what is preserved to owners of appropriated or decreed water rights by the provision of the 1972 Constitution is what the law has always contemplated in this state as the extent of a water right: such amount of water as, by pattern of use and means of use, the owners or their predecessors put to beneficial use. Thus an owner may have a decreed right to a certain number of miner’s inches of water; or a statutory appropriative right to a stated amount; or a right depending upon mere use; or even a prescriptive right to a stated amount; nonetheless, the Water Use Act contemplates that all water rights, regardless of prior statements or claims as to amount, must nevertheless, to be recognized, pass the test of historical, unabandoned beneficial use .... To that extent only the 1972 constitutional recognition of water rights is effective and will be sustained.
McDonald, 220 Mont. at 529, 722 P.2d at 604.

 The Department of Natural Resources and Conservation is required to review an appropriator’s reservation every ten years under the statute to determine whether the objectives of the reservation are still being served. All parties agree that Pondera cannot avail itself of § 85-2-316, MCA, because it is not a state entity.

 Colorado deals with future water appropriations through the use of “conditional” water rights. Although I discuss a water right acquired under the doctrine as if it is a completed or a perfected water right, I also explain below that a “condition subsequent” *125 is imposed on the right — requiring that it be put to beneficial use within a reasonable time — which arguably makes the water right a conditional right. Based on the legal issues presented and the facts of this case, it is inconsequential what a right acquired under the doctrine is labeled. Thus, though I speak of a right acquired under the doctrine as a completed or perfected water right, I leave open the possibility that the right may be better characterized in future cases as a conditional water right.

 Curry does not dispute that Pondera is a public service corporation within the meaning of Bailey.

 I do not address the capacity limitation below. It is unclear from the record the extent of Pondera’s system.

 I frequently use “Pondera” in this section to also include its predecessors, but also use “original appropriators” and “Pondera’s predecessors” as well when emphasizing that original intent is the limiting factor of a water right.

 I use the term “issued shares,” as did the Water Master, to denote the sum of the “outstanding shares” and the “treasury shares.” An “outstanding share” is a share of a corporation that has been authorized, issued, and purchased by subscribers and held by them. Black’s Law Dictionary 1643 (Bryan A. Garner ed., 10th ed. 2014). A “treasury share” is a share of a corporation that has been authorized, issued, but retained or reclaimed by the corporation. Black’s Law Dictionary at 1643. Thus, I use the term outstanding shares to represent the shares sold and held by the landowners, and I use the term treasury shares to represent those shares that are held by Pondera. Although there seems to be some confusion over the meaning of these terms, this appears to be the way in which the parties generally understood the terminology.

 Section 18-2001, RCM (1903), et seq.

 The Court also appears to place great emphasis on the MCLB to show intent. Neither the MCLB nor any other public agency had jurisdiction over the acquisition of appropriative water rights in 1953. Sections 89-848, -849, -851, RCM (1969). And, more importantly, the MCLB’s function was not to try the intent of the original appropriators.

 Alternatively, assuming Ponderas completed appropriations with an annual irrigation of 72,000 acres, as Curry correctly argues in the alternative “that claim was lost by failure to put the water to a beneficial use within a reasonable time.” Thus, assuming Pondera perfected water rights in 1921 with a total annual irrigation of 72,000 acres, the rights were lost by Pondera’s “nonuser for an unreasonable length of time.” Bailey, 45 Mont. at 179, 122 P. at 584. The Court’s reasoning to the contrary is unsupported. The Court maintains that “Bailey clearly states that... the right cannot be lost based upon the acts by a third-party shareholder....” Opinion, ¶ 34. Bailey does not stand for such a proposition. Rather, Bailey clearly states that the appropriation “cannot be made to depend for its existence in the first instance upon the voluntary acts of third parties — strangers to its undertaking.” Bailey, 45 Mont. at 178, 122 P. at 583 (emphasis added). In other words, a public service corporation must be able to complete an appropriation unaided by third parties, which the growing communities doctrine allows an appropriator to do. However, under Bailey, an appropriator’s beneficial use remains entirely dependent on the individual appropriators. The corporation’s beneficial use depends on the amount of water it “sells” for a beneficial use — which, in turn, wholly depends on the amount of water the irrigators buy and put to beneficial use. Thus, Pondera’s nonuse is based entirely on the irrigators’ nonuse.

 The Court maintains that Curry merely was unable to successfully refute the evidence of the size of the service area at this stage in the process. Opinion, ¶ 50. But it is unclear what evidence Curry could have presented to do so. In the course of a five-day trial, Curry produced witnesses whose testimony indicated that Pondera did not intend to irrigate 377,000 acres, including Pondera’s former general manager, Fay Stokes; *138 Curry produced data from the USDA, data from the DNRC, the WRS Report from the State Engineer, and the report from Pondera’s former chief engineer, C.E. Atwood, all showing no intent to irrigate 377,000 acres; and Curry introduced aerial mapping showing no intent to irrigate 377,000 acres. Furthermore, during oral argument, Pondera’s counsel conceded that Pondera does not contemplate irrigating 377,000 acres. A claimed place of use under § 85-2-227(1), MCA, is prima facie proof, not conclusive proof. The fundamental problem appears to be with the Court’s use of the term “service area.” The term is undefined and thus unable to be qualified. However, it does appear clear that bona fide intent is not a limiting factor. If so, Curry would have easily rebutted the presumption.

 As a final note, there is language in the Water Master’s report that would seem to suggest that Pondera cannot reassign its corporate shares to lands within or outside its place of use without seeking authorization from the DNRC. However, despite this language, the Water Master did not add a remark to any of Pondera’s claims to this effect. Nor did the Water Master, in its final recommendation to the Water Court, recommend that the Water Court add such a remark. And neither Curry nor Pondera brief the issue. Thus, I will not attempt to ascertain the meaning of the Water Master’s comments or provide a definitive ruling on them. If in the event the Water Master adds a remark on Pondera’s claims stating that it cannot reassign corporate stock to a different area -within or outside its place of use without authorization by the DNRC, Pondera can certainly appeal the issue. I would add, however, that if Pondera seeks to change its place of use from the place delineated on its individual appropriations — the total lands described on the share certificates — Pondera would certainly need to seek DNRC approval. See §§ 85-2-302, -402, MCA.